478 F.Supp. 285 (1979)
Jack WEIT, James B. Cox and Robert W. McLallen, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a corporation, Harris Trust and Savings Bank, a corporation, Pullman Bank and Trust Company, a corporation, Central National Bank in Chicago, a corporation, American National Bank and Trust Company of Chicago, a corporation, all other Illinois banks similarly situated, and Midwest Bank Card System, Inc., a corporation, Defendants.
No. 70 C 1926.
United States District Court, N. D. Illinois, E. D.
September 6, 1979.
*286 *287 Herbert J. Bell, Downers Grove, Ill., for Herbert J. Bell, class plaintiff.
Arnold I. Shure, Chicago, Ill., for H. James Rosenberg.
C. D. Kasson, Burditt & Calkins, Chicago, Ill., for John T. Jenos.
James E. Beckley, A Professional Corp., Chicago, Ill., Francis A. Beninati, Chicago, Ill., John P. Meyer, Danville, Ill., Jeffrey Jahns, Jon R. Waltz, Dennis C. Waldon, William T. Roan & Grossman, Huyck, William R. Warnock, Chicago, Ill., for plaintiffs.
Jerald P. Esrick, Max Wildman, Wildman, Harold, Allen & Dixon, Bryson P. Burnham, John D. Donlevy, Bertram M. Long, Mayer, Brown & Platt, Winston & Strawn, D. J. Retson, Kirkland & Ellis, Carl S. Lloyd, Christine H. Rosso, Chapman & Cutler, Keehn Landis, Chicago, Ill., for defendants.
George W. Groble, pro se.

MEMORANDUM
LEIGHTON, District Judge.
On December 22, 1978, this court granted motions for summary judgment by defendants Continental Illinois National Bank and Trust Company of Chicago, Harris Trust and Savings Bank, and American National Bank and Trust Company of Chicago, as to the charges of horizontal conspiracy alleged in Counts I through IV of the third amended complaint and by defendant Continental as to the vertical conspiracy alleged in Counts III and IV. The cause is now before the court on motions by remaining defendants Central National Bank in Chicago and Pullman Bank and Trust Company, for summary judgment on both the horizontal and vertical conspiracy allegations of Counts I through IV; and defendant Harris, for summary judgment as to the vertical conspiracy alleged in Counts III and IV. For the following reasons, the motions are granted.

I.
Many of the relevant, undisputed facts are stated in the court's memorandum of December 22, 1978. See Weit v. Continental Illinois Nat. Bank & Trust Co., 467 F.Supp. 197, 200-205 (N.D.Ill.1978). The following additional facts, as drawn from the pleadings, depositions, affidavits, answers to interrogatories, and numerous documents produced in the course of discovery, are also relevant to disposition of these motions.

A. Central's Entry into the Midwest Bank Card System
Central was a late entrant into the Midwest Bank Card System; although it began seriously considering entering the bank charge card business in the summer of 1966, it did not actually join Midwest until October *288 of that year. (Frank E. Bauder Dep. 9/18/75 at 12, 43.) In August, Frank E. Bauder, chairman of Central's board, learned of Pullman's planned Illinois Bankcharge from the newspapers and of Midwest's planned program from Robert Logan, Central's senior vice-president. (Id., at 16, 18; Robert Logan Dep. 9/25/75 at 6, 9.) Although no Central representative attended the early organizational meetings held by Continental, Harris, First and Northern, Logan attended a presentation held for many banks of the proposed form of an interbank transfer mechanism for charge cards in late August 1966 as well as a presentation by Pullman. (Robert Logan Dep. at 6, 14-16.)
Faced with what he perceived as a highly competitive situation in expanding bank services, Bauder held a meeting in early September with other Central officers to determine whether Central should enter the charge card business. (Frank E. Bauder Dep. at 13, 20, 26-29.) At the meeting, it was decided that Central should join the Midwest Bank Card System, because it could neither become a separate, independent card issuer since it lacked a sufficiently broad base in retail and merchant customers nor afford not to offer the charge card service because of potential customer loss. (Frank E. Bauder Dep. at 26-27, 45-47; Robert Logan Dep. at 17-18.) Also at the meeting, cardholder interest rate was implicitly determined since all Central officers thought that Central would have to charge the maximum legal rate in order for the program to be financially viable. (Frank E. Bauder Dep. at 29, 42; Robert Logan Dep. at 30-33; Lowell Taylor Dep. 9/24/75 at 60-61.) Central's counsel had advised it that 1.5% per month, or 18% annually, was the maximum rate that could be charged for extended payment privileges. (Frank E. Bauder Dep. at 29; Robert Logan Dep. at 33.) The high interest rate was taken for granted to be necessary since, as Bauder testified:
There was no question in our mindsin my mind that even at that rate we were not going to be able to cover our costs. (Frank E. Bauder Dep. at 29; see PTX 84, at 2.)
Central then applied for membership as a card-issuing bank in the Midwest system in October 1966 and executed the interim agreement establishing the system on October 24, 1966. (PTX 42, 82-83; see PTX 98.) Lowell Taylor, Central's second vice-president, served as Midwest's secretary in 1967. (PTX 136.) And when Midwest ultimately entered the Interbank-Master Charge Bank Card System, Central also became a member (Frank E. Bauder Dep. at 56-59.) During its membership in Midwest, Central's officers had little contact with the other named defendants regarding bank charge cards other than at formal Midwest meetings. (Robert Logan Dep. at 22-23.)

B. Pullman's Entry into the Midwest Bank Card System
Like Central, Pullman was not a member of the compatibility study group of early 1966 and did not become actively involved with Midwest until late September 1966. Unlike its co-defendants, however, Pullman had experience in the charge card field and had planned to issue its own card, Illinois Bankcharge in conjunction with several other small banks. Between 1953 and 1962, Pullman operated a bank charge program called Shoppers Charge. (Robert E. Kennedy Aff. 3/15/76 at ¶ 2.) As with the Midwest Bank Card programs, Shoppers Charge generated interest and merchant discount income. The interest rate originally charged Shoppers Charge cardholders was 1% per month on unpaid balances, but Pullman found the income generated insufficient and, in April 1961, the rate was increased to 1.5% per month. (Id., at ¶ 3.) From 1963 through 1965, Pullman operated Chicago Area Charge Service, a charge card program owned by Pullman for the Chicago area E. J. Korvette stores, which had a monthly interest rate of 1.5%. (Id., at ¶¶ 4-5.) Based on the successful experience with Chicago Area Charge Service, Robert E. Kennedy and W. Richard Murphy, two Pullman officers in charge of the Service, began to study the feasibility of expanding the Service into a general bank charge card in *289 early 1966. (Id. at ¶ 7; W. Richard Murphy Dep. 12/8/72 at 11.) Kennedy and Murphy discussed the idea with Donald O'Toole, the chairman of the board, and Walter Ehrmann, the vice-chairman. (Donald O'Toole Dep. 6/19/74 at 29; W. Richard Murphy Dep. at 15.) Based upon their prior experience in the charge card business, these officers decided that an interest rate of 1.5% would be charged for extended payment privileges; even at that rate, the group anticipated that the program would not become profitable for several years. (Robert E. Kennedy Aff. at ¶¶ 7-8; Donald O'Toole Dep. at 38; W. Richard Murphy Dep. at 22.) As W. Richard Murphy testified, the 1.5% rate was chosen
[b]ecause it was legal and you needed as much as you could get.
* * * * * *
Of course, I know you are aware that in the small loan business, the interest rate has been high because you are dealing in small units.
* * * * * *
[I]t costs us at Pullman just as much to lend you $2,300.00 to buy a Buick as it did to lend the XYZ Company $50,000.00 to buy a diesel tractor, and so when you start dealing in nickels and dimes, you have got to get [the highest] interest rate because of the fact that your administrative cost just kills you.
(W. Richard Murphy Dep. at 22-23.)
Having decided to enter the charge card business and determined the interest rate, Pullman began recruiting other banks to participate in Illinois Bankcharge.[1]
(W. Richard Murphy Dep. at 17.)
As a correspondent of Continental, Harris and First, Pullman received mailings and information about the planned Midwest Bank Card System. (Donald O'Toole Dep. at 40, 42; see PTX 13.) On June 22, 1966, a Continental officer telephoned W. Richard Murphy to inform him that Continental was about to issue its press release on the planned compatible card program. (PTX 5.) On August 11, 1966, Donald O'Toole had dinner with some Continental officers, who, having learned of the Pullman's plans, urged him to defer the start-up date. (Donald O'Toole Dep. at 60-64; PTX 78.) O'Toole declined to postpone announcement of the program, which was imminent, on the ground that the program reflected an enormous investment of shareholders' assets and the bank's plans were set. (Donald O'Toole Dep. at 62.) Nothing was discussed at that dinner meeting other than start-up dates. (Id., at 64.) Pullman announced its program on August 12, 1966. (PTX 10, 457.)
Despite its planned independent program, Pullman continued to discuss the possibility of entering the Midwest system with the other defendants. (See, e. g., PTX 109, 379, 655, 656.) And Midwest members tried to recruit Pullman for correspondent participation in the various banks' programs. (W. Richard Murphy Dep. at 40-43.) On October 24, 1966, John Perkins of Continental told Walter Ehrmann about meetings at the American Bankers' Association convention concerning a nationwide bank charge card and Alfred Lindgren of Continental telephoned Ehrmann on October 31, 1966 to inform him that First had secured an account with the Illinois Restaurant Association. (PTX 109, 379.) Although Pullman initially rejected the overtures and continued developing its own program, it eventually found that the competition with the larger system, particularly in terms of merchant and participating bank recruitment, was too great and concluded that it would be to the bank's advantage to join Midwest as a card-issuing bank. (Compare W. Richard Murphy Dep. at 43 with Id. at 35, 41, 45-50; Robert E. Kennedy Dep. 7/2/74 at 146, 169, 173, 188, 191, 194-96.) As Murphy testified, Pullman got involved with Midwest "[b]ecause we were concerned about the fact that we were going to have competing *290 bank card systems. . . . And also, that we were a failure." (W. Richard Murphy Dep. at 35.) Murphy inquired about Midwest membership and was instrumental in persuading his superiors that Midwest membership was the best way to engage in the charge card business. (Id., at 32; PTX 547.) In the late autumn of 1966, Pullman formally joined Midwest and executed the interim agreement of October 24, 1966 establishing the Midwest Bank Card System. (PTX 35, at 3; PTX 42.) Murphy became Midwest's president in 1967 and, as such, entertained the board of Midwest at least once and concerned himself with entry into the Interbank-Master Charge Association. (PTX 73, 117, 113, 704.)

C. Recruitment of Correspondent Banks by Central
Central, itself a correspondent bank of Continental and Harris, did not start recruiting any correspondent participation in its charge card program until early 1970. (Frank E. Bauder Dep. at 44; Lowell Taylor Dep. at 16-17; Robert Logan Dep. at 56; Frank L. Dwojacki Aff. 1/26/79 at ¶¶ 3-4; PTX 246, 248.) Central did not hold any large recruitment meetings; rather, it approached its correspondents slowly, on an individual basis. (Frank E. Bauder Dep. at 44; Robert Logan Dep. at 56.) During its first year of recruiting, less than a dozen of Central's 250 correspondents joined its program. (Frank L. Dwojacki Aff. at ¶ 5; Frank E. Bauder Dep. at 43.)
Central offered its correspondents a variety of ways to participate in its program, from merely furnishing customer names to Central for card-issuance to issuing their own cards. (Robert Logan Dep. at 56; PTX 84, 248.) The majority of correspondents chose not to issue their own cards and to have Central issue cards to their customers. (Robert Logan Dep. at 56.) Central's contracts with its correspondents made no mention of cardholder interest rate and were terminable at will with notice. (PTX 317, ¶ 12.)

D. Recruitment of Correspondent Banks by Pullman
Pullman's relationship with its correspondent banks was more complicated than the other defendants' because Pullman itself is not precisely a card-issuing bank. Rather, it is one of six banks which formed a joint venture known as Illinois Bankcharge in 1966. Under the Participation Agreement constituting the venture, each bank owned a percentage of the program, although Pullman owned by far the largest share: 44%.[2] (Pullman's Trial Exhibit [hereinafter "Pullman TX"] C38, at 8.) Each bank contributed a percentage of the total amount needed to fund the enterprise and, in return, was entitled to a percentage of the cardholder interest income and merchant discount income generated by the program. The initial agreement which was executed on October 28, 1966 provided that if the cardholder elected to exercise his extended payment privileges, "a service charge of one and one-half per cent (1½%) per month or such other service charge as may be agreed upon by the Banks will be added." (Pullman TX C38, at ¶ 5.) The agreement was modified in March, 1967, after Illinois Bankcharge's entry into Midwest, but the contract modification specifically provides that the earlier service charge clause "shall remain in full force and effect." (PTX 309, at ¶ 2.) Throughout the program, Pullman was invested with primary responsibility for issuing cards and administering the program generally. (PTX 308, ¶¶ 2-7, 14-22; PTX 309, ¶ 6.) For example, Pullman processed applications of the participants' customers and arranged for advertising, although the participants reimbursed Pullman for its expenses. (PTX 308, ¶¶ 4, 6.) Pullman held meetings in the summer of 1966 with its participants to discuss implementation of the program. (PTX 19.)
*291 Besides its five joint venturers, Pullman recruited affiliates for Illinois Bankcharge. In the course of this recruiting, Pullman held meetings at which it discussed various aspects of the program, including the interest rate charged by Illinois Bankcharge. (Pullman's Ans. to Pl. Int. 6/23/71, Nos. 13, 30, 31.) The standard form contract executed by banks choosing to become affiliates provided for issuance of cards to their customers by Illinois Bankcharge directly so that no Illinois Bankcharge affiliate ever shared the credit risk. (PTX 310.) The agreement further provided that the affiliate would use its best efforts to encourage its merchant customers to accept Illinois Bankcharge. (Id.) It was terminable at will upon ninety days prior written notice. (Id.)

E. Recruitment of Correspondent Banks by Harris
Harris held at least two mass meetings in October and December of 1966 to recruit correspondents for its Charge-It program. (Harris Ans. to Pl. Int. March 1974 Nos. 20, 21.) At these meetings, terms and conditions of participation with Harris in the program were discussed, including estimates of projected income and expenses which might be received or incurred by correspondents, and operational questions concerning the establishment of credit criteria, methods of handling collections, methods of dealing with security and fraud problems, and handling customer complaints. (Id.) Members of other card-issuing banks did not attend these meetings nor any other held by Harris with its major correspondents to consider national or regional interchange and other issues in the charge card area. (Id., No. 21.) Harris also supplied participating correspondents with promotional and informational material (PTX 209, 211.) And Harris paid for a limited amount of newspaper and bill-board advertising by correspondents in 1966 and 1967. (PTX 553, 560, 561.) Harris also provided "statement stuffers" to correspondents. (PTX 557, 559.)
Over the years, Harris has had various sorts of agreements with participating correspondents as to the manner in which a correspondent may take part in the Charge-It program. From the inception of the program in 1966 until January 1968, Harris purchased all of the cardholder receivables generated on the charge cards of its participating banks, assuming the full risk of loss, as well as collecting and retaining all receipts and any profit. (Culver Floyd Aff. 1/17/79 at ¶ 3; Harris Trial Exhibit [hereinafter HTX] B30, at § 1.2.) Early in 1968, Harris offered its correspondents the opportunity to share in profits and losses as to their respective receivables generated on their cards. (Culver Floyd Aff. at ¶ 3.) Thereafter, a new form of agreement was offered to the correspondents, which provided that the participating bank could establish any cardholder rate it might wish, but that should it establish a rate different than 1.5% and have Harris participate in a share of the receivables, it must provide for payment to Harris, on the latter's share of the receivables, out of collections, of a return equivalent to 1.5% per month. (HTX B28, § Alternative 1.5.) Later in 1970, Harris offered correspondents the "Bank Service Agreement" pursuant to which Harris would simply provide services to such correspondent in preparing and delivering the charge card to the correspondent's customer, accounting for receipts and collections with respect to both cardholders and merchants, performing the interchange function and dealing with ministerial portions of serving the program for which Harris would be compensated on a specified fee schedule. (HTX B31.) The agreement specifically provided that the correspondent "is free to establish with its Cardholders any lawful periodic rate" which it chose. (Id., at § 3.1.) Correspondents utilizing this Bank Service Agreement bear all risk of loss and do not share profits with Harris; Harris simply provides mechanical services to effectuate interchange and accounting. Finally, in late 1974, Harris formulated yet another program to offer to correspondents, similar to the one used by Continental. See Weit v. Continental Illinois Nat. Bank & *292 Trust Co., 467 F.Supp. at 202-04. Under this "Non-Card-Issuing Bank Agreement", Harris simply issues its charge card to those persons whose names are furnished by the correspondent, and Harris unilaterally determines the rate of interest which it would charge to its cardholders, because it, and not the correspondent, extends credit to the cardholder. (HTX B29; PTX 215, 229.)
Regardless of which program the correspondent elects, it may terminate the agreement upon 30 days' notice (HTX B28, § 7.2; B31, § 6; B29, § 3.3.) After any such termination, Harris "in order that Participant may make such new arrangements as it deems fit, continues service to Participant. . . ." (HTX B28, § 7.4; see also HTX B31, § 6; B29, § 3.3.)

II.
Central, Pullman and Harris argue that none of the documents and deposition testimony on which plaintiffs say they will rely at trial supports an inference of conspiracy among them or between each of them and their respective correspondents to fix the interest rate charged cardholders for extended payment privileges as alleged in Counts I through IV of the third amended complaint.[3] Each defendant points to deposition testimony, affidavits and documentary evidence which, it argues, disclose that the interest rate each charged its customers was determined independently and not arrived at by agreement with each other or their respective correspondents.
In support of its motion for summary judgment, Central relies on the depositions of Frank E. Bauder, Robert Logan, and Lowell Taylor, its chief officers, as well as the affidavit of Frank L. Dwojacki, its vice-president in charge of retail banking. The depositions establish that Central was motivated to join Midwest by fear of an erosion of its customer base and that the decision to charge the maximum legal interest rate was made internally and based on the officers' independent determination that, even at that rate, the program would not be profitable initially. (Frank E. Bauder Dep. at 29, 42; Robert Logan Dep. at 31-33; Lowell Taylor Dep. at 60-61; see PTX 84, at 2.) Frank L. Dwojacki avers that Central did not agree with any of the correspondent banks that Central or its correspondents would charge 1.5% or any other rate of interest to cardholders. (Frank L. Dwojacki Aff. at ¶ 7.) None of the participation agreements offered by Central to its correspondents even mentions interest rate. (PTX 317.)
In support of its motion,[4] Pullman relies on the affidavit of Robert E. Kennedy and the deposition testimony of its chief officers. Kennedy avers that Pullman never considered a lower interest rate than the legal maximum, because of its past experience with Shoppers Charge and Chicago Area Charge Service. (Robert E. Kennedy Aff. at ¶¶ 7-8.) He also avers that no Pullman employee ever entered into an agreement regarding interest rates with any employee of its co-defendant banks. (Id. at ¶ 9(a).) The deposition testimony of Pullman's chief officers also suggests that the interest rate was determined independently on the basis of Pullman's prior experience and without regard to the conduct of its co-defendants. (See, e. g., Donald O'Toole Dep. at 38; W. Richard Murphy Dep. at 22-23.)
Harris relies on documentary evidence and the affidavit of Culver Floyd, its Metropolitan Banking Officer, to support its motion. Floyd avers that, over the years and throughout the various programs implemented by the bank, Harris unilaterally set the interest rate it required with respect to the receivables it purchased under its Participating Bank Agreements (HTX B30, *293 B28) or it generated through its unilateral extension of credit to correspondents' customers under its Non-Card-Issuing Bank Agreement (HTX B29). (Culver Floyd Aff. at ¶¶ 3-4, 6-7.) And to the extent a correspondent assumed part or all of the receivables, it was free to set whatever lawful interest rate it wished, so long as Harris was reimbursed at a 1.5% rate as to that portion of the receivables it purchased, or, if none, so long as Harris' service fee was paid. (Culver Floyd Aff. at ¶¶ 4-5.) From the initiation of the program, as evidenced by its loss projections, Harris anticipated that a substantial portion of its income would be derived from receivables purchased from its correspondents, and that it must have a return of 1.5% per month on its receivables if it were to show any profit eventually from its Charge-It program. (See Harris Group Ex. 1 & 2.) At the same time, Harris did not require its correspondents to agree on interest rates or to charge any particular rate, but only to compensate Harris at a rate calculated as equivalent to 1.5% per month with respect to Harris' risk participation; for themselves, correspondents could set whatever rate they chose.
All defendants also argue that, in light of this court's December 22, 1978 ruling, they are entitled to summary judgment on the ground that the named plaintiffs lack standing.[5] Defendants argue that plaintiffs, as Continental cardholders,[6] could not have been injured by any of these defendants' conduct and have no claim against these defendants following this court's determination that Continental did not conspire with either the other named defendants or any of its correspondents. Defendants also argue that the third amended complaint alleges two conspiracies: a primary horizontal one among the named defendants and a subsidiary vertical one by each defendant with its respective correspondents "to expand participation" in the various card programs. (Third Am. Comp., Ct. III, ¶ 18; Ct. IV, ¶ 19.) Therefore, defendants argue, once the court finds that no unlawful horizontal conspiracy exists among the named defendants, the ancillary vertical conspiracy charges must also be dismissed.
Plaintiffs oppose the motions on several grounds. As to all three defendants, plaintiffs insist, there remain issues of material fact as to whether they conspired with one another and with their correspondents to fix the interest rate charged cardholders for extended payment privileges. As to defendant Central, plaintiffs argue that its continuous contacts with its correspondents, Harris and Continental, placed it in the thick of the information flow at the commencement of Midwest. It received informational mailings from Harris and Continental and met with Pullman to review its program. (See Central Trial Exhibit [hereinafter CTX] D9, D11, D3; Robert Logan Dep. at 6-16.) Following its entry into Midwest, several Central officers became members of Midwest's standing committee and attended numerous Midwest meetings, and Central participated in some joint advertising with the other named defendants during the entry into Interbank. (See PTX 115, 116, 136, 488, 120, 204, 205, 698.)
Defendant Pullman likewise had numerous opportunities to conspire with its co-defendants, plaintiffs argue. Throughout the period that it developed Illinois Bankcharge, Midwest members solicited its participation *294 in their various programs as a correspondent. (See, e. g., PTX 109, 379, 655, 656; W. Richard Murphy Dep. at 40-43.) W. Richard Murphy and Walter Ehrmann maintained constant contact with the members of Midwest, attending mass meetings at which Harris, Continental and First gave presentations to publicize and recruit for their respective programs. (See, e. g., PTX 5, 13.) And once Pullman joined Midwest, plaintiffs urge, its opportunities to conspire increased because W. Richard Murphy became president of Midwest. (PTX 73.) Further, plaintiffs urge, Pullman's participation agreement establishing Illinois Bankcharge with its five correspondent joint venturers contains an explicit price-fixing agreement requiring the participants to impose upon cardholders "a service charge of one and one-half per cent (1½%) per month or such other service charge as may be agreed upon by the Banks. . ." (PTX 308, at ¶ 5; see also PTX 309, at ¶ 2.) (Emphasis added.) This agreement, plaintiffs urge, clearly evidences an unlawful conspiracy between Pullman and its five co-signatory correspondents in establishing the Illinois Bankcharge "sub-system" which ultimately was integrated into Midwest.[7]
As to Harris, plaintiffs urge that its mass recruitment meetings with correspondents in late 1966 provided an opportunity to fix interest rates. (Harris Ans. to Pl. Int. March 1974, Nos. 20, 21.) Its distribution of informational, educational, and promotional material at such meetings furnished a background against which to discuss projected income to correspondents from the Charge-It programand to fix interest rates. (Id., Harris Ans. to Pl. Int. 6-23-71 No. 30; PTX 209, 211.)
Finally, plaintiffs urge that, despite this court's ruling of December 22, 1978, they have standing to recover from the remaining defendants for their conspiracy with one another and their respective correspondent conspiracies. Plaintiffs urge that they are members, and adequate representatives, of a class of cardholders of all defendants because the compatibility feature of the Midwest and Interbank-Master Charge system necessarily harms all cardholders of the defendants when they purchase from any system-affiliated merchant. All cardholders are therefore, plaintiffs argue, within the "target area" of the alleged horizontal and vertical conspiracies.

III.
The legal principles governing the grant of summary judgment in an antitrust case are summarized in this court's earlier memorandum. Weit v. Continental Illinois Nat. Bank & Trust Co., 467 F.Supp. at 208-09, and need not be repeated here. It is sufficient to state that once the defendants as moving parties meet their burden under Rule 56, Fed.R.Civ.P., and demonstrate that the facts on which the plaintiffs rely are not susceptible to the interpretation sought to be given them, plaintiffs must come forward and show the existence of significant probative evidence supporting the inference urged by them or face summary judgment dismissing the complaint. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289-90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co., 513 F.2d 102, 109 n. 10 (2d Cir. 1975.) This case is further governed by the substantive antitrust rule that while proof of parallel business activity does not in itself establish a Sherman Act violation, it is circumstantial evidence from which an agreement may be inferred. First National Bank of Arizona v. Cities Service Co., 391 U.S. at 287-88, 88 S.Ct. 1575; Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. *295 610 (1939). However, such evidence, standing alone, "is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action." Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

A. The Alleged Horizontal Conspiracy[8]
The essence of plaintiffs' case as to Central and Pullman, as with Continental, Harris and American rests on evidence, which defendants do not contest, showing the universal adoption of identical cardholder interest rates which have not changed since the inception of Midwest. The deposition testimony of all of Central's and Pullman's officers, their answers to interrogatories, and documentary evidence show that Central and Pullman independently projected high initial costs and early losses; they independently determined that their respective programs required that the maximum legal interest rate be charged. The uncontradicted testimony of every bank officer consistently denies that interest rates were discussed among the named defendants, or that interest rates were consensually determined. The plaintiffs' showing of parallel business behavior under these circumstances, where each bank faced identical business problems of large initial expense to which reasonable businessmen would respond in the same fashion, does not provide the basis for an inference of the conspiracy which plaintiffs allege.
Under these circumstances, the burden shifts to plaintiffs to come forward with significant probative evidence supporting the inference they urge, to show that the rate set was counter to the defendants' interests and coupled with a motive to enter into an agreement, to demonstrate a "plus factor" or face summary judgment dismissing the complaint. First National Bank of Arizona v. Cities Service Co., 391 U.S. at 289-90, 88 S.Ct. 1575; Venzie Corp. v. United States Mineral Prod. Co., 521 F.2d 1309, 1314 (3d Cir. 1975); Gainesville Utilities v. Florida Power & Light Co., 573 F.2d 292, 301 n. 13 (5th Cir.), cert. denied, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). To discharge this burden, plaintiffs rely on evidence of opportunity to conspire.
Plaintiffs point to the continuous contacts between Central, Pullman and the other named defendants as evidence of multiple opportunities to conspire. In the case of Central, its contacts as a correspondent of two of the early members of Midwest, Harris and Continental, its attendance at mass meetings held by its co-defendants at which group presentations were made of the interchange system, and its participation as an active member of Midwest's standing committee, after it joined, all offer the basis for an inference of conspiracy. Likewise, in the case of Pullman, plaintiffs argue that its attendance at mass recruitment meetings held by Harris, Continental and First, at the same time as it was recruiting for its planned Illinois Bankcharge, as well as its participation as a Midwest member thereafter, lead to an inference of conspiracy. But this heavy reliance on the various organizational and recruiting meetings cannot raise an issue of material fact, because plaintiffs have confronted every person who attended those meetings, examined the minutes of and documents generated by those meetings, and found no evidence which affirmatively supports their theory.
The evidence shows that both Central and Pullman entered the charge card business and set the cardholder interest rate *296 for independent, individual reasons. Central determined to offer a charge card service in order to preserve its customer base. It chose to issue cards through Midwest because it was not large enough to enter the business separately. The bank's officers assumed that a rate of 1.5% per month would be charged, because they had been advised by counsel that 1.5% per month was the legal maximum, and Central's independent study indicated that, even at that rate, the program would not be profitable initially. An internal memorandum prepared by Frank E. Bauder regarding Central's entry into the Midwest Bank Card System recognizes the difficulties faced by the Central Card program:
Our posture will be basically a defensive one in [all] customer areas and the plan used as an offensive tool, if at all, in the Personal Banking area. It seems highly unlikely that we can effectively out-do competition in either the Merchant or Correspondent Bank area, and sheer costs may prohibit us from aggressively merchandising the plan to the public.
We will be competitive as to rates and terms, but we will not cut prices in hopes of further penetrating the market.
We must minimize our commitment to management time and marketing costs to cover direct cost of the plan as soon as humanly possible. We will make every effort to minimize credit losses.
* * * * * *
Immediate action [on card-issuance criteria and procedures] may substantially reduce our initial loss experience. . . . (PTX 84.)
The deposition testimony of Central's officers consistently denies the existence of conspiracy and indicates that, even charging the maximum legal rate, initial credit losses and high start-up costs would make the program unprofitable for some time. (See Frank E. Bauder Dep. at 28-29, 42; Robert Logan Dep. at 31-33; Lowell Taylor Dep. at 60-61.)
As to Pullman, the evidence shows that its officers independently selected an interest rate of 1.5% per month on the recommendation of W. Richard Murphy and Robert E. Kennedy who had administered Pullman's earlier charge card program, Chicago Area Charge Service. The deposition testimony of Pullman's officers suggests that no other rate was ever considered, as Pullman's experience established that administrative costs were too high for the bank to consider charging less. (W. Richard Murphy Dep. at 22-23; Robert E. Kennedy Aff. at ¶¶ 7-8; Donald O'Toole Dep. at 38.)
Both defendants have offered sworn denials of the existence of any conspiracy and a persuasive rationale for their parallel conduct which is consistent with their individual interests and with competitive, independent behavior. Under these circumstances, an inference of conspiracy from the evidence of opportunity to conspire would be illogical. The evidence of opportunity to conspire cannot alone bar summary judgment, since "[i]f the most that can be hoped for is the discrediting of defendants' denials at trial, no question of material fact is presented." Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co., 513 F.2d at 110. "Facing the sworn denial[s] of the existence of conspiracy, it [is] up to plaintiff[s] to produce significant probative evidence by affidavit or deposition that conspiracy existed if summary judgment [is] to be avoided." Lamb's Patio Theatre v. Universal Film Exchanges, 582 F.2d 1068, 1070 (7th Cir. 1978). Plaintiffs have failed to produce such evidence. And a review of all the evidence regarding the entry of Central and Pullman into the Midwest Bank Card System and, later, into the Interbank-Master Charge Association only confirms the conclusion reached by this court in its memorandum of December 22, 1978:
whether viewed as a failure to produce significant probative evidence tending to support the complaint, or evidence of action contrary to their economic interests and of motivation to conspire, or evidence of a "plus factor" plaintiffs have failed to rebut defendants' showing that the complained of conduct was the product of independent business decisions rather than conspiracy. Under these circumstances, *297 defendants' motions for summary judgment as to the horizontal conspiracy allegations of the complaint must be granted.

Weit v. Continental Illinois Nat. Bank & Trust Co., 467 F.Supp. at 214.

B. The Alleged Vertical Conspiracy
Because the court has determined that all named defendants independently set their cardholder interest rate policies based upon considerations of a nonconspiratorial nature, the issues of plaintiffs' standing to press a claim concerning the various banks' relationships with their respective correspondents and of the viability of a claim concerning the subsidiary vertical conspiracy are raised. Named plaintiffs and class representatives, Weit, McClannen and Cox, are Continental cardholders, and their only nexus to any Harris, Central or Pullman cardholders is in the event that the rates charged to Harris, Central, Pullman and Continental cardholders are affected by an unlawful conspiracy in which such banks participate. Since this court has found no unlawful conspiracy between such banks, neither the named plaintiffs themselves, nor any class to which they belong, has suffered any injury on the part of Harris, Central or Pullman, and there is no common question of fact with regard to the remaining defendants.
Plaintiffs urge that the compatibility feature of Midwest and Interbank necessarily harms all cardholders of all defendants when they purchase from any system-affiliated merchant. The compatible card system, plaintiffs argue, is the vehicle by which the price-fixing conspiracy is maintained, so any "sub-system" fix harms all compatible cardholders, as they are all within the "target area" of the conspiracy.
The "target area" concept of antitrust standing has been interpreted, in this circuit, to confer standing on all persons who, with reasonable foreseeability, would be affected by the anticompetitive conduct. See Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d 1163, 1168-69 (7th Cir. 1978), cert. denied, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979); see also In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 127-29 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); see generally, Lytle & Purdue, Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation, 25 Am.U.L.Rev. 795, 802-07 (1976). While the relationship between the requirements of "standing" and "antitrust damages" remains somewhat unclear,
[I]t would appear the circuits all view the treble damages suit as too lethal a cannon to put in the hands of anyone who has suffered only an "indirect," "secondary," or "remote" injury.

Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d at 1168.
The court cannot conclude that the compatible features of the charge card system are connected with any conceivable antitrust claim, as plaintiffs now argue, that would allow three Continental cardholders to press a claim against Harris, Central and Pullman for alleged injuries done to Harris', Central's and Pullman's cardholders under circumstances where the court has already found that each of those banks set its rate independently. Moreover, the compatible features of the Midwest and Interbank systems are merely procedures for the interchange of sales slips which are generated at merchant places of business, and the various regulations of the systems relate to the mechanization of the interchange system. There is no connection between the operations of the interchange system and the charges any particular bank makes to its cardholders for the use of extended payment credit. The "target area" of any conspiracy between Harris, Central, Pullman and their respective correspondents can only be those persons to whom Harris, Central, Pullman or their correspondents issue bank charge cards. Named plaintiffs are not such persons; they could not have suffered any damage as a result of any such conspiracy; and they cannot represent any class of persons holding cards issued by Harris, Central or Pullman or their respective correspondents.
*298 The court further notes that the allegations of this suit have been consistently viewed by all parties and another judge of this court as charging a vertical conspiracy which was an aspect of the horizontal conspiracy, although such vertical conspiracy would also be a separate Sherman Act violation. The relevant counts of the third amended complaint allege that the named defendants and their correspondents "combined and conspired . . . to expand bank participation . . ." in Midwest and Interbank. (Third Am.Comp.Ct. III, ¶ 18; Ct. IV, ¶ 19.) And plaintiffs have characterized the conspiracy between any named defendant and its correspondents as "an integral part of the comprehensive scheme that has succeeded in maintaining the same cardholder interest rate for 13 years" because "[t]he named [d]efendants could not have maintained their horizontal conspiracy unless each `sub-system' avoided competition." (Pl.Br. in Opp. to the Mo. of Def. Harris for Summary Judgment 2/20/79, at 5.) Judge McMillen has held that proof of a conspiracy between a defendant bank and its correspondents would be evidence of a conspiracy between the defendant banks pursuant to Rule 404, Fed. R.Evid. (Decision, June 14, 1977, McMillen, J.) Further, only one class was certified on Counts I through IV. See Weit v. Continental Illinois Nat. Bank & T. Co. of Chicago, 60 F.R.D. 5 (N.D.Ill.1973). The court concludes from all these facts that the remaining vertical claims must fall because the basis for their existence, the allegation of a conspiracy among the named defendants, can no longer be maintained in light of this court's ruling of December 22, 1978.
Even assuming that plaintiffs have standing to challenge the alleged subsidiary vertical conspiracy and that such a challenge does not fail since the primary, horizontal conspiracy has been found not to exist, Harris and Central are still entitled to summary judgment, although Pullman has not demonstrated the absence of any issue of material fact as to its relationship with its five joint venturers in Illinois Bankcharge. As to Harris and Central, plaintiffs argue that the recruitment of correspondents in Harris' case, at mass meetings, in Central's case, on an individual basisprovided an opportunity to conspire which gives rise to an inference of conspiracy. But evidence of opportunity to conspire is insufficient, standing alone, to bar summary judgment where, as here, both Harris and Central have offered sworn denials of the existence of conspiracy and there is no affirmative evidence that the dissemination of interest rate information to correspondents solicited to participate in the banks' program ever rose to the level of agreement.
As to Central, the evidence shows that its correspondents were offered a variety of ways to participate in its program, from issuing their own cards to simply providing customer names to Central for card-issuance. The agent contract offered correspondents by Central contained no mention of cardholder rate and was terminable, with or without cause, upon 90 days' notice. (PTX 317). As to Harris, the variety of participation arrangements available to its correspondents suggests that it did not conspire with them to fix interest rates, for only to the extent that Harris owned the receivables did it set the interest rate. (HTX B28-B31.) Where Harris owned the receivables, of course, it had a right to determine the interest rate charged customers because it, and not the correspondent, bore the risk of loss for the extension of credit. Consistent with its loss projections, Harris always required a 1.5% per month return as to that portion of the receivables that it purchased. However, all correspondents were free to set any lawful rate they wished, so long as Harris' return on its receivables remained 1.5% per month. Under these circumstances, it cannot be said that there is any issue of material fact that Central and Harris unilaterally determined the interest rate to be charged where they bore the risk of loss, but did not fix interest rates with those correspondents who chose to participate in their programs.
As to Pullman, the situation is different, for plaintiffs urge not only that *299 correspondent recruitment offered an opportunity to conspire, but that the Illinois Bankcharge program's Participation Agreement contains an explicit price-fixing clause which bars the grant of summary judgment. The court agrees that the Participation Agreement is a "plus factor" which, had plaintiffs standing to raise it, would bar the entry of summary judgment. The agreement explicitly provides that the joint ventures of Illinois Bankcharge will impose upon cardholders "a service charge of one and one-half per cent (1½%) per month or such other service charge as may be agreed upon." (PTX 308, at ¶ 5.) Pullman does not dispute that the provision sets a common price, but urges rather that it does not compete with the other members of Illinois Bankcharge and that the agreement simply established the interest rate on a single bank card which the signatory banks were able to establish collectively. It may well be that Pullman could establish this fact at trial. However, the evidence adduced by plaintiffs affords some basis for the inference that Pullman and its five correspondents prevented the development of price competition between them and diluted the market by entering into a partnership that set a fixed price on the privilege of extended payments for cardholders. But this evidence will not bar the grant of summary judgment as to Pullman because, as was discussed earlier, the named plaintiffs could not have been injured by any conspiracy between Pullman and its correspondents and lack standing to raise any claim against Pullman.
For these reasons, the motions of Central National Bank in Chicago and Pullman Bank and Trust Company for summary judgment on both the horizontal and vertical conspiracy allegations of Counts I through IV are granted; the motion of Harris Trust and Savings Bank for summary judgment on the vertical conspiracy allegations of Counts II through IV is likewise granted. This suit is dismissed in its entirety.
So ordered.
NOTES
[1] Pullman's correspondent recruitment is discussed infra at 290.
[2] The other banks, and their ownership interests, were: County Bank and Trust Company (9%); Hyde Park Bank and Trust Company (14%); Olympia State Bank (5%); Standard Bank and Trust Company (19%); and the First National Bank of Lockport (9%). (PTX 38, at 8.)
[3] The allegations of horizontal conspiracy are: Count I, ¶ 17; Count II, ¶ 18; Count III, ¶ 18; Count IV, ¶ 19. The allegations of vertical conspiracy are: Count III, ¶ 18; Count IV, ¶ 19.
[4] The court notes that Judge McMillen denied an earlier motion for summary judgment by Pullman. (Decision, July 14, 1976, McMillen, J.) This earlier interim ruling does not bar reconsideration of such a motion, now that discovery has been completed and the case is in a posture for trial. See 1B Moore's Federal Practice ¶ 0.404[4], at 453-54 (2d ed. 1974).
[5] The court notes that defendant Central has also filed a motion to dismiss in which the other defendants have joined, arguing that plaintiffs, as consumers, lack standing to sue under section 4 of the Clayton Act, 15 U.S.C. § 15, because they have not been injured in their "business or property" within the meaning of the Act. Since the filing of the motion, the Supreme Court has held that consumers who pay a higher price for goods purchased for personal use as a result of antitrust violations sustain an injury in their "property" within the meaning of section 4. Reiter v. Sonotone Corp., ___ U.S. ___, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Accordingly, Central's motion to dismiss, under Rule 12(b)(6), Fed.R.Civ.P., for lack of standing because of plaintiffs' consumer status, is denied.
[6] All the named plaintiffs received their cards through Continental's Town and Country program. (See Jack Weit, Dep. 9/28/70 at 16; Robert W. McClallen Dep. 10/15/70 at 8-9; James B. Cox Dep. 10/15/70 at 7.)
[7] The court notes that, although Illinois Bankcharge was separately established prior to its entry into Midwest, it was not a functional entity when it joined the Midwest system. (W. Richard Murphy Dep. at 50-51.) As one Pullman officer testified:

Q. Did [Illinois Bankcharge] operate under a different name prior to entry into the Midwest Bank Card System?
A. No, we never really got operative basically. We were just starting to get things under way. (Id.)
[8] The standing of the class representatives to challenge the legality of the named defendants' conduct in Midwest and Interbank cannot be seriously doubted. As Continental cardholders, they would be affected by any unlawful conspiracy in which all named defendants participated. While the court's earlier ruling that Continental, Harris and American did not conspire among themselves or with the other named defendants is necessarily a determination that the other named defendants, Central and Pullman, did not conspire with Continental, Harris or American, the motions of Central and Pullman provide the court with another opportunity to review all of the evidence of contacts between Continental and the two movants and determine whether any issue of material fact precludes summary judgment.