Jack WEIT et al., Plaintiffs-Appellants,

v.

CONTINENTAL ILLINOIS NATIONAL
BANK AND TRUST COMPANY OF
CHICAGO et al., Defendants-Appellees.

Nos. 79-1077 & 79-2113.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1980.

Decided Feb. 11, 1981.

Rehearing and Rehearing En Banc
Denied April 13, 1981.

James E. Beckley, Dennis C. Waldon, William T. Huyck, William R. Warnock, Roan & Grossman, Franklin J. Lunding, Jr., Biggam, Cowan & Lunding, Chicago, Ill., for plaintiffs-appellants.

Keehan Landis, Bryson P. Burnham, Carl S. Lloyd, Jerald P. Esrick, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, CUDAHY, Circuit Judge, and CAMPBELL, Senior District Judge.*

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois is sitting by designation.

1. *Weit v. Continental Illinois National Bank and Trust Co., et al.*, 467 F.Supp. 197, 214 (N.D.Ill.1978); and *Weit v. Continental Illinois National Bank & Trust Co.*, 478 F.Supp. 285, 298 (N.D.Ill.1979).

CAMPBELL, Senior District Judge.

Plaintiffs appeal from the entry of summary judgment on their claim of a price-fixing conspiracy in violation of Sections 1 and 2 of the Sherman Act. The District Court concluded that after eight years of discovery plaintiffs had failed to produce any significant probative evidence to support the complaint.[1] Based on our review of the record we, too, conclude that plaintiffs are unable to point to any significant probative evidence in support of the allegations in the complaint. Accordingly, we affirm.

This class action was initiated in 1970 by three charge cardholders in the Midwest Bank Card System, Inc. and its successor the Interbank-Master Charge Card System, Inc. (Mastercharge), against five Chicago banks. The plaintiffs alleged that defendants, Continental Illinois National Bank & Trust Company of Chicago (Continental), Harris Trust and Savings Bank (Harris), Pullman Bank and Trust Company (Pullman), Central National Bank in Chicago (Central), and American National Bank and Trust Company (American), conspired to fix the interest rate paid by consumer credit cardholders on extended payments at 1.5% per month, or 18% per annum.[2] Plaintiffs alleged that defendants engaged in a horizontal conspiracy among themselves, and a vertical conspiracy among themselves and their respective correspondent banks in Illinois. Plaintiffs sought five hundred million dollars in damages before trebling and injunctive relief requiring renegotiation of cardholder rates on an individual basis.[3]

This controversy arises out of the formation of the Midwest Bank Card System by the defendant banks. As the District Court noted, the circumstances surrounding the

---

2. First National Bank of Chicago (First) was named as a coconspirator, but not as a defendant in this action.

3. "Pursuant to free market criteria and individual credit ratings." Plaintiff's Third Amended Complaint, Count I, Prayer for Relief.

formation of Midwest and its successor, Mastercharge, are not in dispute.[4] Those facts are set forth in detail in the District Court's opinion. *See Weit v. Continental Illinois National Bank & Trust Co.*, 467 F.Supp. 197, 200–205 (N.D.Ill.1978). However, a brief summary of the Midwest system is appropriate.

In early 1966, First National Bank of Chicago held a meeting attended by representatives of Continental, Harris and the Northern Trust to discuss the establishment of a compatible credit card program. The idea of establishing a credit card system was well received, and further meetings ensued. A representative of American also participated in these meetings as an observer.

The banks sought to establish a compatible credit card system. That is a system which permits a card issued by one bank to be used for purchases from participating merchants who deal with other banks. The card issuing bank provides the consumer with a plastic charge card. The cardholder agrees to pay his bank for monies advanced to cover purchases by the cardholder with the charge card. The cardholder can use the charge card to make purchases from any merchant who accepts the Midwest Charge card. The merchant simply forwards the signed charge ticket to his own bank, and is credited with the full amount of the charged purchase, less a small "discount" or fee. The merchant's bank then receives a credit from the cardholder's bank. At the end of each month the cardholder is billed by his bank for the total amount of purchases made during the period. The merchant's bank generates revenues by charging the merchant a fee or "discount" for its services. If the cardholder pays his bank the full amount due within a specified period, he incurs no finance or interest charge. If he defers payment, however, his bank charges him interest on the unpaid balance. That interest rate, and how it was arrived at, is the subject of this controversy.

The Midwest Bank Card System, Inc. is a non-profit corporation established by the defendant banks, except American,[5] to administer the compatible charge card system. The defendant banks established the Midwest System in 1966 to facilitate the transfer or "interchange" of funds among participating banks. The defendants maintain that compatibility and a facilitated interchange of funds is essential to a successful bank charge system. Midwest was established, they argue, solely to assure an efficient compatible system.

The defendant banks also contend that an important aspect of a compatible charge card system is the integration of correspondent banks into the system. A correspondent bank maintains a deposit balance with a larger Metropolitan bank. The Metropolitan banks, in turn, provide services to their correspondents. Since Illinois is a "unit banking" State, which limits the use of branch banks,[6] major Metropolitan banks, such as the defendants, establish correspondent relationships with smaller banks in lieu of opening branches in other areas. Some banks would establish several correspondent relationships with major Metropolitan banks.[7] Each defendant recruited its correspondent bank to participate in the Midwest System. Plaintiffs claim that in doing so the defendants also conspired with their correspondent banks to fix the rate of interest charged at 18% per annum.

The initial meetings during the Spring and Summer of 1966, attended by representatives of defendants Continental and Harris, and by representatives of First and the Northern Trust, are outlined fully by the District Court and need not be restated here. *See Weit v. Continental, supra,* at 200–205. Continental and Harris were

4. 467 F.Supp. at 199.

5. American did not join the Midwest System until 1969.

6. *See* Ill.Rev.Stat., Ch. 16½, § 106.

7. For example, State National Bank of Evanston was a correspondent of Harris, American, First, Continental and Northern. It affiliated with Continental's charge card system in September of 1966.

joined by Central National Bank in the Fall. Northern Trust dropped out of the program in August of 1966. Representatives of Pullman, a correspondent of First, Harris and Continental, began attending meetings in August. On October 24, 1966, First, Continental, Harris, Central and Pullman executed an interim agreement establishing the Midwest System. Midwest's regulations permitted membership by any commercial bank. On March 26, 1969, American petitioned for membership and became a member on May 16, 1969.

From the outset the defendant banks were aware of the potential anti-trust problems inherent in a joint venture such as this. At an early meeting on May 26, 1966, lawyers for First raised the anti-trust issue. The group agreed at that time, on advice of counsel, to exclude from their discussion interest rates, fees, advertising, and market research. On July 25, 1966, Miles Seeley, counsel for Continental, submitted a memorandum to the group warning that discussions must be limited to planning a compatible credit card system and prohibiting any discussion of "fees, discounts, billing and extended credit terms." [8] Thereafter, a member of Seeley's firm was present at all meetings to assure that this policy was adhered to, and that interest rates were not discussed, "even in jest." [9] Initial drafts of the "Compatible Credit Card System for Chicago Area Banks" also stated that card issuing banks "will be completely and solely responsible to determine . . . credit policies and interest rates." [10]

Nevertheless, plaintiffs argue, each defendant bank arrived at the same interest rate.[11] The defendants had ample opportunity to discuss interest rates at meetings of the Midwest group, at annual bankers' meetings, and even on social occasions. Plaintiffs point to several instances in the record where representatives of the defendant banks did discuss interest rates, though in the context of Illinois usury regulations. Plaintiffs further rely on an affidavit submitted by their expert, Bernard Shull, to the effect that "conscious cooperation" on the part of the members of the Midwest System was the likely cause of the 18% interest rate.

Plaintiffs argue that in addition to these factors which were considered by the District Judge, the lobbying efforts by the defendant banks also suggest the existence of a price fixing conspiracy. Those lobbying efforts were expressly not considered by the District Court.[12]

When the Illinois General Assembly convened in 1967, several bills were introduced regulating interest charged on consumer credit cards. The general interest rate limit under the Illinois Usury Statute was 7% per annum. The Chief Counsel to the Illinois Comptroller [13] had, however, issued separate opinion letters to First and Continental indicating that National Banks could, under the Consumer Finance Act, charge 3% interest per month on balances up to $150, 2% on balances between $150

8. Krazley deposition ex. 8E; Prater deposition, ex. 50; excerpt from Prater deposition, app. 224-225.

9. *Id.* at p. 225.

10. Wood deposition, exhibit 6.

11. While each bank charged a rate of 1.5% per month, the banks did not employ the identical method of calculating interest. For example, Continental computes interest on an "Adjusted Balance Method", that is, by calculating interest on the balance due during the previous billing cycle to the date of a payment, and then computing interest on the remaining balance, if any, up to the current statement. Harris employs a "Closing Balance Method" whereby all payments received during a billing cycle are deducted from the previous balance. Central

and American compute interest on the basis of an average daily balance during a given billing cycle. Pullman calculates interest on the basis of the balance due at the beginning of a billing cycle, without crediting for payments made. These differing methods of computation result in a slightly different cost of borrowing to the cardholder.

12. *Weit v. Continental*, 467 F.Supp. at 207–208, Nt. 22.

13. Defense counsel continually refer to this agency as the "Comptroller of the Currency". We note that no such office exists, and under Article I, Section 8 of the U.S. Constitution could not exist.

and $300, and 1% on the remaining balance above $300. There was no Illinois precedent in accord with that conclusion. Several of the bills pending in the Legislature would have limited charge card interest to 1% per month. The defendant banks engaged a lobbyist, William R. Dillon, to seek passage of a bill which would permit monthly credit card interest of 1.5%. Dillon's efforts were successful, as the Legislature approved House Bill 2071 which contained the 1.5% limit.

Plaintiffs contend that this evidence, provided by sworn affidavit or deposition, should at least create a genuine issue of material fact sufficient to defeat a defense motion for summary judgment under Rule 56, F.R.C.P.

The District Court found that the defendant's parallel interest rate; the opportunity to conspire to fix those rates; the specific references to interest rates in the record; and the opinion of Professor Shull did not create a reasonable inference of the conspiracy which plaintiffs alleged. 467 F.Supp. at 210–211. In support of their motion for summary judgment, defendants, as they must, came forward with testimony under oath refuting plaintiffs' allegations. This evidence showed that each defendant had independently projected the costs and early losses from the credit card system, and independently arrived at 1.5% per month as the minimum interest rate they could charge. The Court below noted that every employee of the defendant banks who participated in the formation of Midwest denied, under oath, that there had been any discussion relating to a fixed or agreed interest rate. The Court found that the parallel rates were not surprising since each defendant faced the "identical problems of fraud, credit losses, and large initial expense, to which reasonable businessmen would react in the same fashion." 467 F.Supp. at 210–211.

Also, the Court noted that 1.5% per month was the rate then charged on other consumer credit cards and by retail establishments offering their own credit.

The Court found that defendants had shifted the burden to the plaintiffs to come forward with "significant probative evidence to support the complaint," citing *First National Bank of Arizona v. Cities Service*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The District Court concluded that, after more than eight years of discovery,

... plaintiffs have confronted every person who attended those meetings, examined the minutes of and documents generated by each meeting, and found no evidence which affirmatively supports their theory. 467 F.Supp. at 211.

## SUMMARY JUDGMENT

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact ..." Rule 56(e) provides that when a motion for summary judgment is supported by sworn denials, as is the case here, the burden shifts to the plaintiff to "set forth specific facts showing that there is a genuine issue for trial."

By entering summary judgment the Court is, in effect, concluding that based on the evidence upon which the plaintiff intends to rely at trial, no reasonable jury could return a verdict for the plaintiff.[14]

In the instant case the District Judge reviewed the evidence in the record at the conclusion of a lengthy period of discovery and found no significant probative evidence of a conspiracy to fix interest rates. Based on our independent review of the record, we, too, are unable to uncover any such evidence, and conclude that further proceedings in this case would result in a waste of limited judicial time and resources.[15]

14. In plaintiffs' answers to interrogatories filed January 6, 1978, plaintiffs identified the 964 documents and 53 witnesses on which they intended to rely at trial.

15. The dissent suggests that plaintiffs produced evidence that Continental, Harris and Pullman knew the interest rates being contemplated by each other. This evidence is that Harris noted

## THE ALLEGED HORIZONTAL CONSPIRACY

■ Plaintiffs contend that circumstantial evidence in the record—parallel rates and the opportunity to conspire—are sufficient to meet their burden under Rule 56(e). Clearly, circumstantial evidence can be sufficient to support a finding of a price-fixing conspiracy. *Interstate Circuit v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Parallel business behavior or "conscious parallelism" is the type of circumstantial evidence which, absent more direct evidence, will be relied on in inferring unlawful agreement. *Theatre Enterprises v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). However, when defendants come forward with denials sufficient to shift the burden under Rule 56(e), plaintiffs must come forward with some significant probative evidence which suggests that conscious parallelism is the result of an unlawful agreement. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1962); *Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co.*, 513 F.2d 102 (2d Cir. 1975). Parallel behavior and the hope that something further can be developed at trial is not sufficient to warrant a trial on the merits. *Cities Service* at 290, 88 S.Ct. at 1593; *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Conscious parallelism in the instant case could support a wide range of inferences.

One logical inference is that the 1½% per month interest rate reflected a business decision as to what rate the market for consumer credit would bear, and eventually prove profitable as well. An equally plausible inference, and one supported in the record, is that the already established rate of consumer credit was 1½% per month, as reflected by Bank Americard and retail outlets offering installment credit.[16] If plaintiffs are to proceed to trial, they must be able to point to some probative evidence that parallel interest rates resulted from unlawful agreement rather than lawful business reasons.

■ Plaintiffs rely heavily on the opportunity to conspire as probative evidence of unlawful conspiracy. The dissent also attaches significance to the close personal ties among the members of the Chicago banking community. Yet, the mere opportunity to conspire,[17] even in the context of parallel business conduct, is not necessarily probative evidence. *See Venzie Corporation v. United States Mineral Products Co.*, 521 F.2d 1309 (3rd Cir. 1975); *Overseas Motors, Inc. v. Import Motors Ltd.*, 375 F.Supp. 499, 535 (E.D.Mich.1974), aff'd 519 F.2d 119 (6th Cir. 1975). This is especially the case when the need to set up a compatible card system requires a degree of cooperation. The only rational inference here is that the need to set up a compatible system mandated that defendants work together. Given the need for some degree of cooperation in a venture of this nature, the opportunity to conspire evidence lacks significant probative value.

that states other than Illinois permitted an interest rate of 1½% per month, and that Continental referred to a "regular 1½% per month interest charge" during the course of discussions with the President of Bank Americard. This is hardly evidence that Pullman, Harris or Continental knew what interest charge had been decided upon by each bank. Yet even assuming that awareness of contemplated interest rates is the logical inference to be drawn from those statements, mutual awareness of similar conduct does not run afoul of the Sherman Act. "This awareness must be an element entering into each party's decisional process, and the basis for inferring that it did so must be something more substantial than a guess." *Brown v. Western Massachusetts Theatres,*

*Inc.*, 288 F.2d 302, 305 (1st Cir. 1961) (on petition for rehearing).

16. The record indicates that the Wall Street Journal, on May 24, 1966 noted Bank Americard's interest rate of 1½% per month and that the defendants were aware of this. Ex. A to Continental's response to Interrogatories, January 3, 1978, pp. 23–24.

17. The District Court characterized the bulk of this evidence as falling into the "mere possibility range." 467 F.Supp. at 211. We agree. The fact that the Chairmen of Harris and Continental both served as trustees of Northwestern University is of little relevance, much less probative value.

Of greater significance is the sworn testimony compiled during eight years of depositions which uniformly denies discussion of any agreement or understanding as to the interest rate to be charged.

■ It is suggested that while parallel pricing alone is not sufficient to establish a price-fixing conspiracy, such evidence together with an opportunity to conspire is sufficient to rebut defendants' denials and require a trial on the merits. *See C–O–Two Fire Equipment Co. v. United States,* 197 F.2d 489 (9th Cir. 1952), *cert. denied* 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952); *Esco Corporation v. United States,* 340 F.2d 1000 (9th Cir. 1965).[18] However, when the plaintiff or prosecution relies on circumstantial evidence alone, the inference of unlawful agreement rather than individual business judgment must be the compelling, if not exclusive, rational inference. *Pevely Dairy Co. v. United States,* 178 F.2d 363 (8th Cir. 1949). Indeed, the Court in *Pevely* stated:

> Where circumstantial evidence is relied upon to establish the conspiracy or any other essential facts, it is not only necessary that all the circumstances concur to show the existence of such conspiracy and facts sought to be proved, but such circumstantial evidence must be inconsistent with any other rational conclusion.[19]

*Pevely,* as well as *C–O–Two* and *Esco* were criminal cases with differing standards of proof. Nevertheless, it is interesting that the court in *C–O–Two* distinguished *Pevely* on the basis of the product in question. The Court stated the milk (the alleged price-fixed product) "approaches fungibility."[20] The defendants did business in the same area, paid a fixed regulated price for the product and incurred virtually identical labor costs. Similarly, in civil anti-trust cases, Courts have noted that parallel pricing or conduct lacks probative significance when the product in question is standardized or fungible. *Bendix Corporation v. Ballax, Inc.,* 471 F.2d 149, 160 (7th Cir. 1972); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656 (9th Cir. 1963).[21]

In the instant case, the product in question is consumer credit, or more fundamentally, the cost of borrowing money for a given period. The underlying product—money—is not only fungible, it is by definition an interchangeable medium of exchange. The defendants' own cost of money is highly regulated and, on a given day and specified amount, the cost is uniform. Thus, it is hardly surprising, or significant, that the defendants charged a parallel interest rate[22] given their parallel costs. We agree with the District Court's conclusion as to the only rational inference to be drawn from parallel pricing in this case:

> The showing of parallel behavior under these circumstances, where each bank faced identical problems of fraud, credit losses, and large initial expense to which reasonable businessmen would react in the same fashion, does not provide a basis for the inference of the conspiracy which plaintiffs allege.[23]

Thus, parallel interest rates, together with evidence that the opportunity to conspire existed—when measured against defendants' denials, parallel economic cost factors, and the need for a compatible charge card system—does not support a rational inference of an unlawful conspiracy.

---

**18.** We note that in both *C–O–Two* and *Esco* numerous co-defendants entered pleas of nolo contendere prior to the trial of these named co-defendants.

**19.** 178 F.2d at 367. In *Pevely* the Court reversed the district court's denial of a motion for judgment of acquittal after the jury returned a guilty verdict.

**20.** *C -O–Two,* 197 F.2d at 496.

**21.** In *Bendix* this Court overturned the trial court's finding of improper price influencing for lack of evidence. In *Independent Iron Works* the Court affirmed the trial court's directed verdict on a concerted boycott claim.

**22.** As indicated at *footnote 11 infra,* the cost of borrowing to the cardholder is not identical at each bank due to the individual bank's method of calculating interest.

**23.** 467 F.Supp. at 210–11.

Plaintiffs suggest that summary judgment should rarely be entered in anti-trust cases due to the central role of motive and intent issues. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, no greater caution or concern for litigants' rights is required in the anti-trust context than in other substantive areas of Federal Court litigation. *Lupia v. Stella D'Oro Biscuit Company, Inc.*, 586 F.2d 1163, 1167 (7th Cir. 1978), *cert. denied* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

This Circuit has recognized that "the very nature of anti-trust litigation would encourage summary disposition . . . when permissible." *Lupia v. Stella D'Oro*, 586 F.2d at 1167. The statutory remedy of treble damages creates a "special temptation for the institution of vexatious litigation." *Id.*, citing *Poller*, 368 U.S. at 478, 82 S.Ct. at 493 (Harlan, J., dissenting). Also, anti-trust actions have proven to be especially protracted, and difficult for jury consideration. *See United States v. United Gypsum Co.*, 438 U.S. 422, 465–469, 98 S.Ct. 2864, 2887–2889, 57 L.Ed.2d 854 (1978); *ILC Peripherals Leasing Corporation v. International Business Machines Corporation*, 458 F.Supp. 423, 445–448 (N.D.Cal.1978). Indeed, in the *ILC* case the District Judge, after a five month trial which ended in a deadlocked jury and a mistrial, concluded that the case was "beyond the ability and competency of any jury to understand and decide rationally." 458 F.Supp. at 448.

We simply cannot turn our heads and ignore the practical realities of complex anti-trust litigation. A trial of this nature places a substantial burden on jurors who are seldom prepared to analyze the complexities of anti-trust claims.[24] As Chief Justice Burger has so appropriately noted: ". . . it borders on cruelty to draft people to sit for long periods to cope with issues largely beyond their grasp." [25]

■ When a District Court has afforded the parties eight years of unlimited discovery, the parties have designated the evidence on which they will rely at trial, and the Court has had an opportunity to review the evidence and concludes that no reasonable jury could return a verdict for plaintiffs, judicial economy mandates that summary judgment be entered. See e. g. *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102 (2d Cir. 1975). A trial on such claims would serve only as a forum for impeachment and argument by counsel; not for the presentation of evidence. If the District Court, on the eve of trial, concludes that extensive and complete discovery has produced no evidence to support the complaint, summary judgment should be entered. As the Court noted in *Cities Service*:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an anti-trust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint. 391 U.S. at 290, 88 S.Ct. at 1593.

■ We believe the instant case is precisely the kind contemplated by the Court in *Cities Service*. The allegations have been met with consistent sworn denials and there has been a more than adequate period of discovery. Yet, plaintiffs can point to only two instances where interest rates were even discussed, and then only in the context of state usury laws, or the rate that Bank Americard was charging.[26] These

---

24. When the Court in *ILC* asked the foreman of the jury whether this type of case should be tried to a jury, the foreman responded:

"If you can find a jury that's both a computer technician, a lawyer, an economist, knows all about that stuff, yes, I think you could have a qualified jury, but we don't know anything about that." (Tr. 19,548), 458 F.Supp., at 447.

25. Remarks of the Chief Justice of the United States, Meeting of Conference of Federal Chief District Judges, Little America Hotel, Flagstaff, Arizona, Aug. 7, 1979.

26. The dissent attaches considerable significance to the use of the term "regular interest" rate in the discussions with Bank of America.

two statements relating to interest rates during the several years of planning and implementation of the Midwest System, even when coupled with rate parallelism and an opportunity to conspire, do not rise to the level of "significant probative evidence" within the meaning of *Cities Service*.

Plaintiffs suggest that *Cities Service* is inapposite because that case involved a claim of refusal to deal rather than price fixing.[27] When price fixing is alleged, they suggest, circumstantial evidence should receive greater weight on a motion for summary judgment. Yet, a conspiracy to fix prices and a group boycott are both proscribed by Section 1 of the Sherman Act. Both are *per se* violations of the Act.[28] Neither case lends itself to proof by direct evidence. There is no basis for altering the standard for summary judgment to conform to a lesser quantum of evidence in either case. If plaintiffs' circumstantial evidence of conspiratorial conduct is so insignificant that a rational jury could not find for plaintiffs, summary judgment is appropriate irrespective of the substantive nature of the complaint.

The dissent suggests that in the instant case, unlike in *Cities Service*, plaintiff has produced evidence of motive. It is suggested that this motive evidence distinguishes *Cities Service* from this case. In *Cities Service* the plaintiff[29] alleged that Cities

Service Co. and six other large oil companies refused to purchase oil from him because plaintiff was selling Iranian oil. The alleged motive for the group boycott was retaliation against nationalization of property owned by one of the defendants, and an effort to force return of the property by a boycott of all oil produced in that country. The Court found that given no contrary evidence a jury "might well be presented as to Cities' motives in not dealing with Waldron."[30] However, the Court affirmed the entry of summary judgment because "the record . . . contains an overwhelming amount of such contrary evidence of Cities' motives."[31] Similarly, a motive is suggested for conspiratorial conduct in the present case, but the evidence in the record does not support that motive. The dissent mistakenly construes defendants' concern about "chaos in the market" as an admission of anti-competitive motive in forming the Midwest System.[32] Clearly, the defendant banks were concerned with the possibility that either an out-of-state bank or one Chicago bank would initiate its own credit card system.[33] If each bank in Chicago plus several large out-of-state banks initiated their own system, the likely result would be chaotic. The evidence suggests, however, that by chaos the banks did not mean competition as to interest rates, but a retail market in which a vast number of charge cards existed. Merchants would have to

Yet that was the "regular" rate charged Bank Americard holders.

**27.** Plaintiffs attempt to classify *Cities Service* as an "individual refusal to deal" case. It is not. The complaint alleged concerted conduct. Indeed, since Section 1 of the Sherman Act proscribes "every contract, combination . . . or conspiracy in restraint of trade . . ." individual conduct does not run afoul of Section 1, by definition.

**28.** *See Klors Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *U. S. v. Socony Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**29.** The original plaintiff was Gerald Waldron. Upon his death the First National Bank of Arizona, his executor, was substituted as plaintiff. *See Cities Service*, 391 U.S. 253, 259 n. 1, 88 S.Ct. at 1578 n. 1.

**30.** 391 U.S. at 277, 88 S.Ct. at 1586.

**31.** Id.

**32.** A Continental internal memo of August 11, 1966 noted, "if anyone goes in Chicago, others will and this may result in chaos in the market. Could be disastrous [sic] . . ."

**33.** A Harris internal memorandum of December, 1966 noted, "it would be very difficult for any one bank in Chicago to successfully operate a broad credit card plan in our area because of our unit banking system. And, even if tried, others would soon initiate similar and competitive plans resulting in a chaotic state of affairs as far as the public and the merchants were concerned."

accept many if not all of these cards and then would have to look to each individual bank for payment. A compatible system permits the merchant to look to his own bank for the entire payment irrespective of which bank may have issued the card to the customer. While defendants were clearly concerned about a chaotic credit card market, the record suggests their concerns were not anti-competitive or conspiratorial. Rather, they were legitimate business concerns. We, therefore, do not agree with the dissent's finding of an anti-competitive motive in this case.

Plaintiffs rely, as does the dissent, on *Poller v. Columbia Broadcasting*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) in support of the contention that issues of anti-competitive intent are particularly appropriate for jury consideration. The Court in *Cities Service* noted several factual distinctions between that case and *Poller* which could be applied in the instant case as well.[34] Ultimately, however, these other cases are distinguished on the basis of the inferences which may reasonably be drawn from the evidence in the record. Our review of the record leads us to the conclusion that the circumstantial evidence in support of the complaint is so insubstantial when measured against the evidence in support of defendants' denials, as to preclude a verdict for plaintiffs. Summary judgment on the claims of horizontal conspiracy is therefore appropriate.

## EVIDENCE OF LOBBYING ACTIVITIES

■ Plaintiffs also contend that the District Court erroneously declined to consider the evidence of defendants' lobbying activities, and that had that evidence been considered, summary judgment should have been denied. The dissent concurs in that view.

The argument for admissibility of this evidence is that it is relevant to the question of whether defendants conspired to fix interest rates. As the dissent points out, an inference can be drawn that the banks would not have worked together in lobbying for passage of a bill in the legislature unless they had implicitly agreed on an interest rate as well. We agree that such an inference could be drawn. Our problem with this evidence is that it more directly suggests an agreement to influence legislators on behalf of a particular bill under consideration. In *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Court held that such conduct does not violate the Sherman Act, even though there may be an anti-competitive motive behind such conduct.[35] In *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court reaffirmed that principle. The Court in *Pennington* noted:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself, violative of the Sherman Act.[36]

The District Court noted that such conduct is immunized from anti-trust liability under the *Noerr-Pennington* doctrine, but stopped short of excluding it on that basis.[37] Rather, the District Judge concluded that the prejudicial quality of this evidence outweighed its probative value. Since he would exclude such evidence at trial, he declined to consider it on summary judgment. The basis for the Court declining to consider this evidence was its "minimal probative value" as compared to its "inevitable prejudicial effect."

Rule 403 of the Federal Rules of Evidence permits the Court to exclude relevant evidence "if its probative value is substan-

---

**34.** For example, the Court in *Cities Service* noted that in *Poller* a competitive relationship existed between the plaintiff and defendant. In both *Cities Service* and the instant case there is no competitive business relationship. 391 U.S. at 285, 88 S.Ct. at 1590.

**35.** 365 U.S. at 140, 81 S.Ct. at 531.

**36.** 381 U.S. at 670, 85 S.Ct. at 1593.

**37.** 467 F.Supp., at 207–208 N. 22.

tially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."[38] The evidence of defendants' lobbying activity poses a serious problem of confusion of issues.[39] The likely confusion is that the jury will consider this evidence as probative of an agreement to influence public officials to enact a favorable interest rate. While an inference of a separate agreement to fix consumer credit rates could be drawn from this evidence, the more direct link is to the defendants' legislative efforts which *Noerr-Pennington* immunizes from anti-trust liability. An appropriate cautionary instruction could be fashioned so as to draw the jury away from consideration of the immunized conduct as the antitrust tort and toward other possible inferences. Yet, the more likely result is that the jury, unskilled in the constitutional considerations of *Noerr-Pennington*, would conclude that the passage of a favorable consumer credit limit was the product of an unlawful conspiracy. We believe that confusion of issues is the probable result of admission of this evidence. Given the lack of any substantial evidence of an antitrust conspiracy in the instant case, the threat of prejudice from admission of this evidence is considerable. The lack of other probative evidence of conspiracy would serve to focus the jury's attention on the lobbying evidence. This could easily result in a finding of antitrust liability for engaging in the First Amendment right to petition which *Noerr-Pennington* protects. We believe the District Court correctly excluded this evidence from consideration on the motion for summary judgment.

## THE ALLEGED VERTICAL CONSPIRACY

Plaintiffs also claim that Continental, Harris, Central and Pullman conspired between themselves and their correspondent banks to fix interest rates charged to consumers and discount rates charged to merchants, in violation of Section 1 of the Sherman Act. The District Court entered summary judgment on the claim of vertical price-fixing by Continental in its Order of December 22, 1978. 467 F.Supp. 214–216. The rationale for entry of summary judgment was that the plaintiffs, in the face of sworn denials by Continental, had failed "to produce any significant probative evidence ... that a conspiracy existed." *Id.* at 216, citing *Lamb's Patio Theatre v. Universal Film Exchanges*, 582 F.2d 1068, at 1070. The District Court entered summary judgment for defendants Harris and Central in its order of September 6, 1979.[40] The District Court noted at the outset the plaintiffs were cardholders of Continental and not within the "target area" of any conspiracy between defendants. The Court concluded that since plaintiffs could not have suffered any damage as a result of such conspiracy they cannot represent any class of persons holding cards issued by Harris, Central or Pullman. The Court went on to find that even assuming standing plaintiffs had failed to point to any evidence suggesting that interest rates were the result of anything other than independent business decisions. The Court also noted that the vertical conspiracy allegations "must fail because the basis for their existence—the allegation of a conspiracy among the named defendants—can no longer be maintained in light of this Court's ruling of December 22, 1978." 478 F.Supp. at 298.

With regard to plaintiffs' claims against Pullman, the Court found that there were sufficient "plus factors" to withstand summary judgment. However, plaintiffs had no standing to raise a claim against Pullman since they were not cardholders of the

---

**38.** Generally, the Rules of Evidence apply to pre-trial proceedings including summary judgment considerations. *See* F.R.E. 101; *American Security Co. v. Hamilton Glass Co.*, 254 F.2d 889, 893 (7th Cir. 1958).

**39.** The dissent suggests that 403 is designed to exclude only that evidence which tends to horrify, or evoke sympathy or anger. While the

tendency to suggest an emotional decision is one basis for exclusion of evidence under Rule 403, it is clearly not the only one. Advisory Committee Notes quoted in Weinstein's Evidence ' 403[03].

**40.** 478 F.Supp. 285 (N.D.Ill.1979).

charge cards issued by Pullman or its correspondent banks.

The District Court has given a comprehensive summary of the role played by correspondent banks and their relationship to the named defendant banks which need not be recapitulated here.[41] We agree with the District Court's conclusion that once judgment is entered as to the horizontal conspiracy claim there is little viability remaining to the vertical conspiracy claim. Nevertheless, the issue of standing aside, a genuine issue of fact as to a violation of the Sherman Act, Section 1, would exist had plaintiffs presented evidence of an agreement between the defendants and their respective correspondents to fix interest rates or discount fees.

Defendant Continental supported its motion for summary judgment by affidavits of its Vice President in charge of correspondent banking to the effect that no agreement to set rates existed between Continental and its correspondents because Continental *alone* set the interest rate charged on all charge cards issued through its correspondents. The standard contracts between Continental and its correspondents support that position. The only fact which could provide any support for any anti-trust theory was that Continental and its correspondents did not compete for charge card customers. That alone does not create an inference of conspiracy. To the contrary, in light of the evidence demonstrating the high costs of the Midwest System, the more reasonable inference is that the correspondents did not compete because they were not in a financial position to do so. The evidence before the District Court shows that Continental set the terms and conditions of its credit card—including the interest rate it would charge cardholders—and conveyed that decision to its correspon-

dents.[42] The correspondents were free to accept Continental's terms, affiliate with another system,[43] or start their own credit card network. We believe the District Court correctly concluded that there was no evidence on which a jury could find a conspiracy between Continental and its correspondents.

With regard to Harris, the District Court found that Harris simply purchased receivables generated by its correspondent banks until January of 1968. At that point Harris offered its correspondents an opportunity to share in the risk and profits or losses on receivables generated by the correspondents. From that point until late 1974, Harris, unlike Continental, let its correspondents decide on the interest rate charged to their customers. Harris required a 1.5% return on its share of those receivables at first, but changed to a set fee paid by the correspondents. At no point during this period did Harris require its correspondents to charge any prearranged interest rate. In 1974 Harris switched to a system similar to Continental's whereby Harris issued cards to those cardholders referred by its correspondent banks, and Harris alone set interest rates.

With respect to Central, the District Court found that it did not begin soliciting correspondent banks until 1970.[44] At that time Central issued bank charge cards to some customers referred by correspondents and also permitted correspondents to issue their own cards. Central did not make any provision for interest rates in any contracts with its correspondents.

In the face of what the Court below found to be legitimate business relationships, plaintiffs are unable to point to any evidence of agreement or conspiracy. Here, as in the alleged horizontal conspiracy, plaintiffs can point only to the opportunity

---

41. For a discussion of Continental's relationship with its correspondents, *see* the District Court opinion, 467 F.Supp. at 202–204, 215–216. Harris' and Central's correspondent relationships are detailed at 478 F.Supp. 290–294, 297–298. Pullman's correspondent relationships are set out at 478 F.Supp. 290–291 and 297–299.

42. See e. g. deposition of Alfred Lindgren, pp. 60–61 and depo., ex. No. 9.

43. Such as the Bank Americard System which the First had become affiliated with.

44. Central was itself a correspondent of both Continental and Harris.

to conspire; the ability to conspire; but no evidence of actual conspiracy. The District Court correctly concluded that this is not sufficient to create a genuine issue of material fact as to the existence of a conspiracy. *First National Bank of Arizona v. Cities Service*, 391 U.S. at 286–288, 88 S.Ct. at 1591–1592. *See also Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163 (7th Cir. 1978), *cert. denied* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

## STANDING TO MAINTAIN THE VERTICAL CONSPIRACY CLAIMS

The District Court noted that plaintiffs lack standing to complain of any injury resulting from Harris' and Central's relationship with their correspondent banks. Yet, the Court went on to find that even assuming standing to challenge the alleged vertical conspiracy plaintiffs had failed to point to any significant evidence of an agreement to fix interest rates between Harris and Central and their correspondent banks. Because we affirm the entry of summary judgment on that basis we need not address the standing question as it relates to Harris and Central. With regard to Pullman, however, the District Court dismissed the vertical conspiracy claim solely on the basis of standing. We, therefore, address the question of whether plaintiffs have standing to assert a vertical conspiracy claim against Pullman.

■ Section 4 of the Clayton Act, 15 U.S.C. § 15, permits anyone who has been "injured in his business or property" to maintain a private action for treble damages. As the Supreme Court's opinion in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) indicates, the injury must be a direct one. In addition to this requirement of "antitrust injury," a plaintiff in any lawsuit must show that he has sustained or is in immediate danger of sustaining some direct injury from the defendant's actions. *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). A plaintiff who does

not have such a stake in the outcome lacks standing to maintain the action irrespective of the merits of the asserted claim.

The Court below noted, as has this Court, that the distinction between the "antitrust injury" requirement of Section 4 and the more general standing requirement is often blurred. 478 F.Supp. at 297. *See also Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d at 1168–69. This is not surprising in antitrust actions as the two requirements overlap considerably. The labels are not important, however. The fundamental requirement is that plaintiffs establish a sufficient nexus between the defendant's alleged actions and an injury to plaintiffs.

■ Here the plaintiffs are unable to establish that nexus. The named plaintiffs are cardholders of only Continental's Midwest chargecards. The fact that they purport to represent Pullman cardholders who would have standing to complain of a vertical conspiracy between Pullman and its correspondents cannot create standing to bring an action. If plaintiffs lack the requisite stake in a controversy at the time the complaint is filed, they may not bootstrap that element into their claim by means of class action certification. *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (3d Cir. 1970). Similarly, plaintiffs who have not suffered antitrust injury from an alleged conspiracy cannot bring themselves within the "target area" simply by purporting to represent those who are. *See Lupia v. Stella D'Oro*, 586 F.2d, at 1168–69. The District Court correctly concluded "the named defendants could not have been injured by any conspiracy between Pullman and its correspondents and lack standing to raise any claim against Pullman." 478 F.Supp. at 299.

For the reasons set forth herein, the judgment of the District Court is AFFIRMED.

FAIRCHILD, Chief Judge, dissenting.

Plaintiffs alleged that defendants, five Chicago banks, violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, by conspiring between themselves and with

their correspondent banks to fix the interest rates they charged as member banks of the Midwest Bank Card System, Inc., and its successor, the Interbank-Master Charge System, Inc. ("Mastercharge"). The district court entered summary judgments for all defendants on all counts.[1] I would affirm the summary judgments for defendants Continental, Harris and Central as to the charges of a vertical conspiracy with their respective correspondents. I would reverse the summary judgment granted to defendants Continental, Harris, Central and Pullman on the horizontal conspiracy.

## I.  THE STANDARD OF REVIEW

The issue before this court is whether this court is satisfied that a properly instructed jury, giving full weight to plaintiffs' evidence, drawing every reasonable inference in its favor, and subjecting defendants' evidence to a critical eye, could not rationally find that plaintiffs were entitled to any relief. *Ambook Enterprises v. Time, Inc.,* 612 F.2d 604, 611 (2d Cir. 1979), *cert. dismissed,* —— U.S. ——, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980). *See Continental Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).[2] That the issues may be particularly difficult for jury consideration is immaterial to the merits of plaintiffs' claim. The court should only consider whether, after examining all the evidence, plaintiffs' case remains devoid "of *any* significant proba-

tive evidence tending to support the complaint." *Ambook Enterprises v. Time, Inc., supra,* 612 F.2d at 611, citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

## II.  THE HORIZONTAL CONSPIRACY

### A.

As the majority and the district court noted, the circumstances surrounding the formation of Midwest in 1966 and its successor, Mastercharge, are not in dispute. *Weit I,* 467 F.Supp. at 199. The significance of plaintiffs' evidence introduced in support of their allegations of a horizontal conspiracy is more readily apparent, however, when viewed in light of certain salient facts about the Chicago banking community and the credit card industry at the time of Midwest's formation. Plaintiffs produced evidence to show the following.

In 1966, the Chicago banking market was an oligopoly dominated by First National Bank[3] and Continental.[4] Illinois prohibitions against branch banking[5] contributed to this high level of concentration.[6] Defendants' officers knew each other personally, attended many of the same functions, and were members of the same clubs. *Weit I,* 467 F.Supp. at 206–07. Kenneth Zweiner, chairman of Harris, and Tilden Cummings, of Continental, worked together for 20 years as trustees of Northwestern Universi-

---

1. The district court's opinion granting summary judgment for defendants Continental, Harris and American as to the charges of horizontal conspiracy and for Continental as to the charge of vertical conspiracy is reported in *Weit v. Continental Ill. Nat'l Bank & Trust Co.,* 467 F.Supp. 197 (N.D.Ill.1978) (hereinafter *"Weit I"*). The decision granting summary judgment for defendants Central and Pullman on both the horizontal and vertical conspiracy claims and for defendant Harris on the vertical conspiracy claim is reported at *Weit v. Continental Ill. Nat'l Bank & Trust,* 478 F.Supp. 285 (N.D.Ill. 1979) (hereinafter *"Weit II"*).

2. On appeal from a grant of summary judgment, the appellate court is to review the record and determine for itself whether there are any genuine issues of material fact. 6 Pt. 2

*Moore's Federal Practice* ¶ 56.27[1], at 56–1555 (2d Ed. 1980).

3. First was named as a non-defendant co-conspirator in Counts I and III of plaintiffs' third amended complaint. Although First was a founding member of Midwest, it left Midwest and joined the Bank Americard System in 1970. *Weit I,* 467 F.Supp. at 200 n. 3.

4. Shull Aff. at 2.
   Defendants Harris and Pullman are state chartered banks, and defendants Continental and Central are nationally chartered banks, as is First National Bank.

5. Ill.Ann.Stat. ch. 16½, § 106 (Smith-Hurd Supp.1980).

6. Shull Aff. at 3.

ty.[7] David Kennedy, chairman of Continental, and Frank Bauder, president of Central, knew each other "very well" because Bauder had worked with Kennedy at Continental.[8] James R. Kennedy, who ran the Town and Country Charge Card Program at Continental,[9] became American's second vice-president in charge of the bank's charge card operations, which he designed, instituted and managed.[10] Thus, the very nature of the Chicago banking community facilitated the exchange of pricing information. *Gainesville Utilities Dep't v. Florida Power & Light Co.*, 573 F.2d 292, 303 (5th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). Given this situation, defendants' conduct should be carefully scrutinized for evidence of conspiratorial behavior. *Id.*

Illinois had no credit card interest law in 1966. The Illinois usury statute in effect at that time, however, prohibited interest rates in excess of a 7% add-on per annum, (which Harris counsel said would proximate 14% annually), Ill.Ann.Stat. ch. 74, § 4 (Smith-Hurd 1966), and defendant Harris, a state bank, assumed that it would be bound by this statute. *See* Plaintiffs' Ex. 1, quoted in *Weit I*, 467 F.Supp. at 200. The federal statute governing the nationally chartered banks (defendants Continental and Central, and First) provided that they could charge interest at the rate allowed by the laws of the state in which the bank is located. 12 U.S.C. § 85 (1976). In determining what state law it was bound by, defendant Continental looked to the Illinois Consumer Finance Act, Ill.Ann.Stat. ch. 74, § 19 *et seq.* (Smith-Hurd 1966), which applied to small consumer loans and allowed an interest rate of 3% per month on loans up to $150.00, or 36% per annum, 2% per month or 24% per annum on the balance of the loans exceeding $150 and not exceeding $300, and 1% per month, or 12% per annum, on any part of the unpaid balance exceeding $300. *Id.* at § 31. Continental interpreted this Act as allowing a 1½% per month, or 18% per annum maximum overall effective rate. *Weit I*, 467 F.Supp. at 201. Without attempting to resolve these seemingly conflicting positions, I assume throughout this opinion that the limitations on the two types of banks differed as the parties thought.

Defendant banks began discussing the idea of a joint charge card in 1966 so as to prevent competition from outsiders and to prevent any one Chicago bank from taking the lead in the new charge card market. Continental was afraid that outsiders would enter the market, resulting in chaos.[11] Continental believed that First's motive in proposing a joint system was to prevent Continental from getting a head start.[12] At the same time, Continental didn't want First, Harris and Central to start a charge card system "while we were sitting over there without a charge card."[13] High start-up costs and large initial losses were projected, *Weit I*, 467 F.Supp. at 201, so defendants were anxious to avoid an outbreak of competition. Gaylord Freeman, president and later chairman of First testified "... since nobody had a viable credit card [in 1966] and it was all new and if one of the others had aggressively merchandised the card at a lower cardholder interest rate, I think [First] would have to go too, at the lower rate, too." *Id.* at 207.

In the spring of 1966, then, when the subject of bank credit cards was "... in the

---

7. Deposition of Kenneth V. Zweiner at 17.

8. Deposition of David M. Kennedy at 64–65.

9. Deposition of James R. Kennedy at 357.

10. Deposition of Arthur Stump at 40, 76–77.

11. A memorandum by Thomas G. Patterson to John B. Tingleff, both Continental officers, stated "[Valley National Bank, Phoenix] believes that if anyone goes in Chicago others will and this may result in chaos in the market. Could be [disastrous]." *Weit I*, 467 F.Supp. at 200.

12. Plaintiffs' Ex. 6: Feasibility Study—Continental Illinois Nat'l Bank & Trust Co., dated July 1966, at 45–46.

13. Deposition of Sheldon Swope, Vice-President of Continental, at 45.

air," [14] First hosted a meeting attended by representatives of Continental, Harris and Northern Trust [15] to discuss the feasibility of a credit card program. The notes of this meeting, held on May 22, 1966, summarize a discussion about the maximum legal interest rate:

Lewis [of Harris, a state bank] commented that the maximum must be no more than the equivalent of 7% add-on per annum, or less than 14%. Foote [of Harris], who said he had looked into credit cards on his own for Harris some months ago, found specific revolving credit enabling legislation in other states where 1½% per month is in effect. Wood [of First] commented that this is troubling First's lawyers, too.

Plaintiffs' Ex. 1, quoted in *Weit I*, 467 F.Supp. at 200. Representatives of the four banks met again on May 26, 1966. The minutes of this meeting state that "Wood [of First] said the First's lawyers had two legal questions—rate and anti-trust—and the anti-trust seemed to be the easier of the two." *Id.* The group began meeting regularly after this. American was not a formal participant, but sent a representative. Central, a correspondent bank of both Harris and Continental, did not participate in these early meetings, but received status reports on the formation of a compatible system.[16] Pullman, a correspondent of First, Continental and Harris, did not attend the group meetings either, as it was planning to issue its own bank credit card. Pullman received mailings about the compatible system, however, and in June, a Continental officer called a Pullman officer to tell him about a pending Continental press release on the joint system. *Weit II*, 478 F.Supp. at 289.

During these early meetings, the group determined that card design, imprints and forms would be uniform, and that a participating merchant directory, a list of cancelled or stolen cards, and a merchant instruction booklet would be jointly issued. *Weit I, supra* at 200. They also agreed that their correspondent banks could retain their relationship with local merchants in return for soliciting card holders. *Id.* at 203. Without this latter agreement, the four banks would have solicited correspondents' customers directly, provoking the correspondents into forming their own bank credit card systems, thereby diluting the market. *Id.*

In late June, 1966, officers of First, Continental, Harris and Northern flew to San Francisco to consult with the Wells Fargo Bank about the Western States Bank Card Association.[17] The next day, these officers met with the president of Bank Americard Service Corporation to discuss Bank Americard's revenues and expenses, including the "regular 1½% per month" interest charge.[18]

In July, 1966, the four banks retained Information Sciences Associates, a consulting firm with experience in the formation of charge card systems. *Id.* at 200. Later that month, Continental personnel received a memorandum dated July 25, 1966 from Miles G. Seeley, senior partner of Mayer, Brown & Platt, counsel for Continental, limiting discussions with other banks to the subject of planning a compatible card system and specifically forbidding any "discussion (even in jest)" of ". . . [f]ees, discounts, billing and extended credit terms or any other economic terms of the relationship between any bank and its own credit card-holders." [19] The four banks employed Mayer, Brown & Platt to advise them on anti-trust matters, and the Seeley memorandum was distributed to other defendant banks.

---

14. Deposition of Allen Stults, president of American, at 24–25.

15. Northern participated in the original planning sessions, but dropped out of the program in August, 1966. *Weit I, supra* at 200, n. 4.

16. Deposition of Frank Bauder at 37; Defendants' Ex. D9 and D11.

17. Plaintiffs' Ex. 93 and 140.

18. Memorandum of Robert K. Miller to John Tingleff, dated July 14, 1966, Ex. A to Defendant Continental's Answers to Plaintiffs' Interrogatories, filed November 11, 1977 at pp. 23–24.

19. Prater Deposition, Ex. 50; Kranzley Deposition, Ex. 8E.

From this point on, counsel monitored the meetings of defendants' "study group" to ensure anti-trust compliance.[20]

During this time, defendant Pullman was going ahead with plans to issue its own charge card. Pullman intended to announce its card, which was to have an interest rate of 18% per annum, on August 12, 1966, and the program was to begin on November 7, 1966. *Weit II*, 478 F.Supp. at 288–90. The other banks knew about Pullman's plans. A description of the Pullman credit card program, including the cardholder interest rate, appeared in the feasibility study prepared by Continental in July, 1966,[21] and on August 5, 1966, at a meeting of the Continental Advisory Committee, Alfred Lindgren of Continental reported "that the Pullman Bank has changed their package, and are now offering basically what we are proposing."[22] The night before Pullman's scheduled announcement, three Continental officers had dinner with Donald O'Toole, president of Pullman, and tried to talk him into delaying Pullman's start-up date. *Id.* at 289. O'Toole refused. Continental, Harris and First then decided to advance their start-up dates to early November.[23]

On September 8, 1966, Continental announced its plans for an all purpose charge card.[24] Harris announced its entry into the charge card business the next day,[25] and First made its announcement the following week.[26] All three banks stated that they would be part of a compatible charge card system, and that they would issue their cards in November. None of the announcements mentioned interest rates to be charged future cardholders. At the same time, Northern announced it was dropping out of the program.[27]

Continental, Harris and First continued to inform Pullman of their plans. Finally, in the fall of 1966, Pullman joined the group. *Id.* at 289–90. Mr. Murphy, a Pullman officer who became president of Midwest in 1967, testified that Pullman joined Midwest "[b]ecause we were concerned . . . that we were going to have competing bank card systems. . . . And also, that we were a failure." *Id.*

Central decided to join the group at this time as well. Although it had not participated in or sent a representative to the formal study group meetings, a Central vice-president had attended a presentation on interbank charge card transfers held in late August. *Id.* at 288. Central also knew of Pullman's plans. *Id.* Central officers assumed they would charge the maximum legal interest rate, which their counsel had advised was 18% per annum, or 1½% per month. *Id.*

On October 24, 1966, First, Continental, Harris, Central and Pullman signed the "interim agreement" establishing the Midwest charge card system. *Weit I*, 467 F.Supp. at 202. The agreement mandated certain requirements for all membership banks: uniform floor limits; uniform cash advance limits; uniform merchandising return procedures; uniform advertising limitations; uniform transaction reporting procedures; and uniform card format and design. *Id.* It did not mention charge card holder interest rates. By this time, however, each defendant, with the exception of American,[28] was planning on charging its cardholders an interest rate of 18% per annum, or 1½% per month. Continental, which thought it was bound by the Illinois Consumer Finance Act, could have charged an interest rate of

---

**20.** Deposition of John Mattmiller (Northern), at 39–42.

**21.** Plaintiffs' Ex. 6 at 43.

**22.** Lindgren Deposition, Ex. 2.

**23.** Defendants' Ex. A6; Prater Deposition, Ex. 55 and 56.

**24.** Defendants' Ex. A6.

**25.** Prater Deposition, Ex. 55.

**26.** Prater Deposition, Ex. 56.

**27.** Prater Deposition, Ex. 55.

**28.** American did not join Midwest until 1969, although a representative of American attended the group meetings. *Weit I*, 467 F.Supp. at 202.

36% per annum for the first $150, 24% on the next $150, and 12% on the remaining balance above $300,[29] but settled on an interest rate of 18% per annum, as did Central, which decided 18% was the maximum allowed by law. *Weit II*, 478 F.Supp. at 288. Harris, which assumed it was limited by the Illinois usury law [30] to charging a 7% add-on, or less than 14% annually, *Weit I*, 467 F.Supp. at 200, arrived at the 18% interest rate by charging 1% interest and ½% "service charge" per month.[31] Pullman was also charging an interest rate of 18%.

When the Illinois General Assembly convened in 1967, the Midwest group hired William Dillon, a lawyer and professional lobbyist, to lobby for a credit card interest bill and represent the banks before the Illinois legislature.[32] An early draft of the Midwest bill set the maximum cardholder interest rate at 24%,[33] but later drafts settled on 18%.[34] Midwest paid Dillon for his efforts, even though Dillon thought the bill was unnecessary for the national banks.[35] The legislature passed the Midwest bill which went into effect on July 24, 1967,[36] eight months after the banks first issued their cards at the uniform rate of 18% per annum.

Although American had attended the Midwest organizational meetings in 1966, it did not get into the charge card business until 1968. It then hired James Kennedy, who ran the charge card program at Continental, to establish the program for American. *Weit I*, 467 F.Supp. at 204. American joined Midwest in the spring of 1969, charging the (by now) standard cardholder interest rate of 18% per annum. *Id.* Midwest joined the Interbank Card Association, Inc. (Mastercharge) that year as well. *Id.* at 205. In 1970, First left the Midwest system, joined Bank Americard, and began soliciting the defendants' correspondent banks for the first time. *Id.*

When plaintiffs first filed suit in 1970, defendants were still charging an interest rate of 18%, the same rate being charged today.

Defendants, in their motion for summary judgment, introduced affidavits by and depositions of their officers denying the existence of an agreement and giving business reasons for arriving at the 18% per annum charge card holder interest rate. David M. Kennedy, chairman of the Board of Directors, for Continental, stated that during the summer of 1966, he determined that Continental's charge card should carry the highest interest rate legally permissible so as to make the system, for which Continental projected early high losses, profitable as soon as possible. *Weit I*, 467 F.Supp. at 201. Harris Bank's senior vice-president, Carroll E. Prater, also testified that Harris decided to charge the maximum legal rate because "it was an expensive business to get into ... losses were very high." *Id.*

Pullman officers stated that they arrived at an interest rate of 1½% per month based on their prior experience in the charge card business. *Weit II*, 478 F.Supp. at 289. Even at that rate, they did not expect the charge card program to be profitable for several years. *Id.* Frank Bauder, chairman of Central, testified that by the time Central decided to join Midwest in September of 1966, the 1½% per month interest rate was taken for granted as necessary to cover costs. *Id.* at 288. James Kennedy, American's second vice-president in charge of the bank's charge card operations, gave similar reasons for American's decision to charge 1½% per month. *Weit I*, 467 F.Supp. at 204.

Defendants also argued that it was public knowledge that Bank Americard and other

29. Ill.Ann.Stat. ch. 74, § 31 (Smith-Hurd, 1966).

30. Ill.Ann.Stat. ch. 74, § 4 (Smith-Hurd, 1966).

31. Appellants' brief at 65, citing Plaintiffs' Ex. 105 and 733.

32. Deposition of William Dillon at 13.

33. Dillon Deposition, Ex. 19 and 15A.

34. Dillon Deposition, Ex. 16A.

35. Dillon Deposition at 210–11; Ex. 6 and 9.

36. Ill.Ann.Stat. ch. 74, § 4.2 (Smith-Hurd Supp. 1980).

retail and oil credit cards were charging an interest rate of 1½% per month or 18% per annum. Finally, they relied on written memorandum from their lawyers forbidding the discussion of interest rates as evidence that they did not agree on the uniform interest rate.

### B.

Under Rule 56(e) defendants' denials were sufficient to shift the burden to plaintiffs to produce some significant probative evidence tending to support their complaint. *First National Bank of Arizona v. Cities Service*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968). The critical question then becomes whether plaintiffs presented enough evidence so that a rational trier of facts could find that this uniform interest rate resulted from an agreement among and between defendants rather than from independent identical decisions by individual bankers. *See Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 613 (2d Cir. 1979), *cert. dismissed*, —— U.S ——, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980). In order to infer such an agreement, there must be more than merely parallel business conduct. *See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). I think that plaintiffs did present evidence of more than merely parallel conduct, from which a jury could rationally conclude that defendants Continental, Harris, Pullman and Central agreed on uniform interest rates.

First of all, plaintiffs produced evidence showing that defendants Continental, Harris and Pullman knew the interest rates being contemplated by each. At the very first formal meeting of the group, which representatives of Continental and Harris attended, Harris officers stated they were afraid they may be bound by the Illinois usury limits, but that other states had enabling legislation allowing an interest rate of 1½% per month. From this statement it can be inferred that Harris hoped to charge 1½% per month. Then, in late June, 1966, officers of defendants Continental and Harris, along with representatives of First and Northern, met with the president of Bank Americard and discussed what Continental officers termed the *"regular* 1½% per month interest charge."  (Emphasis added.) From this statement it can be inferred that Continental was planning on charging 1½% per month interest.[37]  Because Continental knew in July, 1966, that Pullman was going to charge its cardholders an interest rate of 1½% per month or 18% per annum, it can be inferred that Pullman told Continental as much.

This exchange of information regarding the "regular" interest rate and the interest rate being charged by Pullman is analogous to "[a] knowing wink [which] can mean more than words" in determining whether defendants agreed to fix prices. *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965). In *Esco*, the court held that an exchange of price information at a meeting called by Esco Corporation's largest competitor was sufficient evidence, when combined with price uniformity, for inferring a price fixing conspiracy:

> [S]uppose five competitors meet on several occasions, discuss their problems, and one finally states—"I won't fix prices with any of you, but here is what I am going to do—put the price of my gidget at X dollars; now you all do what you want."  He then leaves the meeting. Competitor number two says—"I don't care whether number one does what he says he's going to do or not, nor do I care what the rest of you do, but I am going to price my gidget at X dollars." Number three makes a similar statement— "My price is X dollars." Number four says not a word. All leave and fix "their" prices at "X" dollars.

---

**37.** It can also be inferred from this statement that Continental was saying "this is the only rate a bank should charge."  It is interesting to note that Continental referred to 18% as the "regular" interest rate several months before it consulted with Robert Bloom, Chief Counsel to the Comptroller of the Currency, The United States Treasury, regarding its interpretation of the Illinois Consumer Finance Act, *Weit I*, 467 F.Supp. at 201.

We do not say the foregoing illustration *compels* an inference in this case that the competitors' conduct constituted a price-fixing conspiracy, *including an agreement to so conspire*, but neither can we say, as a matter of law, that an inference of no agreement is compelled.... [I]t remains a question for the trier of fact....

*Id.*

Here, defendants Continental and Harris said they wouldn't fix prices,[38] yet in discussions between the two banks, representatives of Harris spoke of 1½% enabling legislation and Continental officers referred to "regular 1½%" interest rates. In the same way, Pullman told Continental what it was going to charge. The Supreme Court has held that an exchange of price information, in an industry dominated by relatively few sellers, is itself a violation of section 1 of the Sherman Act because "[p]rice is too critical, too sensitive a control to allow it to be used even in an informal manner to restrain competition." *United States v. Container Corp. of America*, 393 U.S. 333, 338, 89 S.Ct. 510, 513, 21 L.Ed.2d 526 (1969). If the Supreme Court could find that the exchange of price information was sufficient for inferring a price-fixing agreement, surely we should consider it as some evidence, when combined with subsequent parallel pricing, joint action, product uniformity and motive from which an agreement could be inferred.[39]

Plaintiffs introduced no evidence indicating that defendant Central exchanged any interest rate information with defendants Continental, Harris and Pullman. Yet

when Central joined Midwest in the fall of 1966, it charged the same interest rate as discussed by the other defendants, even though it could have charged the higher rate allowed to National banks. It is not necessary for each defendant to have participated in every act of the conspiracy in order to be charged with such, as long as they had a common purpose connecting their acts. *See Esco Corp. v. United States, supra,* 340 F.2d at 1006. Here, Central participated in other activities from which its participation in the conspiracy can be inferred.

The district court judge did not consider the joint lobbying activities by defendants Continental, Harris, Central and Pullman,[40] stating that the prejudice of this evidence outweighed its probative value. *Weit I,* 467 F.Supp. at 207–08 n. 22. The majority adopts this holding, but I respectfully disagree. Federal Rule of Evidence 403 is meant to exclude evidence which tends to horrify, evoke sympathy or increase a desire to punish due to prior bad acts, and whose probative value is slight. 10 *Moore's Federal Practice* § 403.10[1], at IV–75 (2d Ed. 1979). Defendants' lobbying activities do not fall into any of these categories.

While defendants' united support of the 18% per annum interest rate is not in itself illegal under *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961),[41] it is certainly probative of an existing agreement to fix interest rates at that level. The inference is very readily drawn that defendants could not have worked together on the same bill, at a time when a

---

**38.** Continental circulated the Seeley memorandum forbidding the discussion of interest rates to other Midwest banks, including Harris. *See* nn. 19 and 20, and accompanying text, *supra.*

**39.** Defendants argue that it was common knowledge that 1½% per month was the "regular" interest rate. This does not prevent them from agreeing to charge that rate, however.

**40.** These four defendants were Midwest members when Midwest hired William Dillon.

**41.** Plaintiffs did not allege that this activity in and of itself constituted an illegal conspiracy. Rather, they introduced it as evidence of the

alleged agreement between defendant banks to fix the interest rate of 18%. This evidence thus falls within an exception to the *Noerr* rule being the "established rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny." *United Mine Workers of America v. Pennington,* 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 1593, n.3, 14 L.Ed.2d 626 (1965).

number of different interest rates could have been agreed to, and when defendants had differing understandings regarding the legal restrictions on their interest rates, without implicitly agreeing that 18% was the rate they thought best and would therefore charge. Indeed, this is the rate they were each charging when they agreed to support a credit card interest bill. The Supreme Court has held that such a concerted effort, when defendants conformed to the arrangement, is probative of a price fixing conspiracy. *See United States v. Paramount Pictures*, 334 U.S. 131, 142, 68 S.Ct. 915, 921, 92 L.Ed. 1260 (1948). Thus, defendants' joint lobbying activities should be considered as further evidence of an implicit agreement to charge 18% interest rate per year.

Another factor contributing to the evidence from which an agreement to fix interest rates may rationally be inferred is defendants' express agreement to standardize everything about their charge cards other than marketing strategy and interest rates. Defendants admitted that "[h]omogeneity was legislated into the product by edict. In fact, this identity is the philosophic heart and soul of the compatible agreement each bank must sign to gain admission into the system." [42] Plaintiffs' expert witness testified that these uniform requirements were no more essential to the compatibility of the charge card system and the interchange of sales slips than they are to the interchange of checks.[43]

In a competitive industry, such standardization could perhaps enhance price competition. L. Sullivan, *Antitrust* § 98 at 276 (1977). But in an oligopoly, and plaintiffs have shown that the Chicago banking industry may be fairly characterized as such, non-price competition is valuable, and anything tending to standardize non-price terms harms competition. *Id.*, § 99 at 279. The Ninth Circuit recognized this harm in *C–O–Two Fire Equipment Co. v. United States*, 197 F.2d 489 (9th Cir. 1952), when it

stated that product standardization of a product that is not naturally standardized facilitates the maintenance of price uniformity. *Id.* at 493. Thus, product standardization was another factor, in addition to parallel conduct, from which a conspiracy to fix prices could be inferred. *Id.*

Here, under competitive conditions, credit card characteristics would have changed as independent banks experimented with one or another promotional features and cardholders and merchants gave their business to the banks offering the most attractive combination.[44] Instead, defendants Continental, Harris, Central and Pullman each signed an agreement, on the same day, which artificially homogenized their product and eliminated an area of potential competition. Their defense that such standardization was needed to eliminate chaos among the merchants and public, *see Weit I*, 467 F.Supp. at 211, should not be definitive of the issue, as industry self-regulation should be viewed with suspicion. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220–22, 60 S.Ct. 811, 842–843, 84 L.Ed. 1129 (1940).

Plaintiffs also introduced evidence of defendants' opportunity to conspire. Aside from the formal study group meetings, which representatives of Continental, Harris and American attended, and of which Central and Pullman were kept informed, defendants' officers met informally on numerous occasions. Opportunity to conspire, standing alone, is insufficient for inferring a conspiracy. It may be considered, however, in determining whether all of the evidence, in addition to parallel behavior, warrants an inference of common, rather than individual conduct. L. Sullivan, *Antitrust*, § 110 at 317 (1977). Evidence of meetings between defendants, presenting an opportunity to conspire, were plus factors in finding a price-fixing agreement in *C–O–Two Fire Equipment Co. v. United States*, even though there was no evidence of what was discussed. *C–O–Two Fire Equipment Co.*,

---

**42.** Egan Deposition, Ex. 16 at 99.

**43.** Shull Aff. at 5.

**44.** Shull Aff. at 6.

*supra,* 197 F.2d at 493.[45] And in *Esco Corp. v. United States,* 340 F.2d 1000 (9th Cir. 1965), the court affirmed a jury finding of price-fixing based on evidence that defendants were at two meetings during which the elements necessary to price fixing were discussed, although there was no evidence of an agreement other than parallel behavior. The court stated:

> As in so many other instances, it remains a question for the trier of fact to consider and determine what inference appeals to it (the jury) as most logical and persuasive, after it has heard all the evidence as to what these competitors had done before such meeting, and what actions they took thereafter, or what actions they did not take.

*Id.* at 1007.

Defendants denied any discussion of interest rates at these formal and informal meetings. But the fact of their meetings, combined with their knowledge of the interest rates to be charged by fellow defendants, their decision to lobby together in the legislature for an 18% rate and their express agreement on non-interest aspects of their parallel conduct, provide sufficient evidence from which a jury could infer that interest rates were in fact discussed. The jury should have the opportunity to decide for itself that defendants' denials are more credible than plaintiffs' circumstantial evidence of an agreement.

Finally, plaintiffs introduced evidence of defendants' motive to conspire. It was plaintiffs' inability to show a motive to agree and benefits obtained through the agreement which led the Supreme Court to affirm a summary judgment for defendants in *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 287, 88 S.Ct. 1575, 1591, 20 L.Ed.2d 569 (1968). In the present case, defendants admitted the motive for doing exactly what they are accused of: defendant officers testified that they were afraid of aggressive competition in the new market for credit cards, which they thought would result in chaos. If someone entered the market at a lower rate, which Harris thought it may have been forced to do, given the state usury laws, the other defendants may have marketed their cards at a lower rate as well. None of the banks wanted to face this possibility as they were afraid of large losses in starting the new program.[46]

Defendants introduced independent business reasons to explain their decisions to charge an 18% per annum interest rate. It is up to the jury, however, and not the trial judge, to decide which explanation for defendants' action is more reasonable. *See Continental Baking Co. v. United States,* 281 F.2d 137, 143–46 (6th Cir. 1960).[47] Fur-

---

**45.** The district court distinguished *C–O–Two* from the present case by saying that a finding of conspiracy was warranted in light of other factors: identical bids, unnecessary product standardization, illegal licensing contracts, dealer policing, and identical price increases at times of surplus, coupled with the fact that the defendants offered no rebuttal evidence. *Weit I,* 467 F.Supp. at 214. Admittedly, plaintiffs in this case have not made as strong a showing of conspiracy as did the government in *C–O–Two.* But this case is not a challenge to the legal sufficiency of the evidence for a criminal conviction. All that is necessary to withstand a motion for summary judgment, which is the only issue at this point, is a showing of at least one other factor, in addition to parallel pricing, from which a jury could infer an agreement. L. Sullivan, *Antitrust* § 110, at 317 (1977). Plaintiffs have shown at least three such factors, and their opportunity evidence merely contributes to the overall picture.

**46.** At the same time, defendant Continental, which thought it was bound by the Illinois Consumer Finance Act, gave up the opportunity to charge a higher interest rate—36% per annum on balances up to $150—which would have enabled it to recoup its projected losses much more quickly. Such an apparent contradiction in self interest "strengthens considerably the inference of conspiracy." *Milgram v. Loews, Inc.,* 192 F.2d 579, 583 (3rd Cir. 1951).

**47.** In *Continental,* the government charged Continental with participating in a price fixing conspiracy and introduced evidence showing that defendants met prior to each price increase. As in *Weit I,* the government did not introduce any evidence of a specific agreement. The trial judge decided for himself that there was an agreement, and consequently refused defendants the opportunity to present evidence of economic factors leading to these price increases. The Sixth Circuit reversed, stating that it was up to the jury to determine whether

thermore, the legitimate business reasons which defendants suggest motivated their actions do not defeat the possibility that defendants acted collusively. *Reading Industries, Inc. v. Kennecott Copper Co.,* 1979–2 Trade Cases ¶ 62,906 at 79,215 (S.D. N.Y.1979). The Supreme Court has stated: "[t]his evidence [of business judgment], together with other testimony of any explanatory nature, raised fact issues requiring the trial judge to submit the issue of conspiracy to the jury." *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 542, 74 S.Ct. 257, 260, 98 L.Ed. 273 (1954). In *Theatre Enterprises,* as in *Weit I,* defendants had denied any agreement and had introduced evidence of local conditions, attributing their uniform action to individual business judgment. The Supreme Court went on to affirm the jury verdict for defendants, over plaintiff's argument that the district court should have directed a verdict, but it was the jury, and not the court making the ultimate decision. When defendants' credibility is at issue, as it was in *Theatre Enterprises* and is in *Weit I,* directed verdicts and summary judgments "should be used sparingly," because "[i]t is only when the witnesses are present and subject to cross examination that their credibility and the weight to be given their testimony can be appraised." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).[48] In the present case, the district judge overstepped his proper role by determining for himself that defendants' explanations were more credible than plaintiffs'

explanation of the evidence. His entry of summary judgment for defendants was therefore improper.

Defendants emphasize that they were warned at an early stage of potential antitrust violations and that their lawyers monitored the study group meetings to ensure compliance. This information should not be dispositive of defendants' evidence. First of all, there is no evidence that the warning was given before defendants started discussing charge card programs on a regular basis. To the contrary, the evidence shows that the warning wasn't given until July 25, 1966, almost two months after defendants began meeting formally, and one month after 18%—or 1½% per month—had become "the regular interest rate." Secondly, lawyers were not present every time defendants met: no lawyer was with the officers of Harris and Continental on their cross-country trip to meet with the president of Bank Americard to discuss "the regular" interest rate, nor was a lawyer present when officers of Continental had dinner with the president of Pullman.

Most importantly, these defendants and future sophisticated defendants should not be allowed to escape allegations of illegal conspiracies as easily as by leaving a paper trail drafted by their lawyers. No conspirator today is going to publicly agree to joint action, nor are they going to leave a written record of their agreement. Instead, conspirators are likely to go to great pains to conceal their agreement, and a lawyer's memorandum would accomplish just this.[49]

---

an agreement existed, based on all the evidence. *Id.* at 143. *Weit I* is analogous, in that here, the trial judge decided for himself that defendants' explanations were more reasonable than plaintiffs and that there was no agreement.

**48.** It is true that defendants' credibility in the present case is not at issue in the same way in which it was at issue in *Poller.* There, the issue was defendants' intent, as their actions in cancelling plaintiffs' affiliation contract and then buying its equipment would have been legal unless done with an intent to monopolize. CBS, in its motion for summary judgment, presented "substantial evidence tending to show the nonexistence of conspiratorial behav-

ior." *Cities Service, supra,* 391 U.S. 253, 285, 88 S.Ct. 1575, 1590, 20 L.Ed.2d 569 (discussing the difference between *Poller* and *Cities Service* ). Nonetheless, the Court held that the denials of unlawful intent by "interested parties," *Poller, supra,* 368 U.S. at 468, 82 S.Ct. at 488, were insufficient to rebut plaintiff's allegations of conspiracy for purposes of granting a summary judgment. *Id.* at 473, 82 S.Ct. at 491.

**49.** I am not implying that defendants' lawyers participated in a cover-up. Defendants could easily have discussed forbidden subjects in their informal meetings, however, while scrupulously obeying their lawyers during formal sessions.

That defendants were warned by their lawyers and were aware of possible anti-trust violations should not be completely disregarded. Rather, defendants' statements that they carefully obeyed their lawyers' warnings should be evaluated by the trier of fact along with plaintiffs' evidence of an agreement.

In sum, plaintiffs have rebutted Continental's, Harris', Pullman's and Central's denials with evidence of more than the merely conscious parallelism held insufficient to withstand a summary judgment in *Cities Service, supra*, 391 U.S. at 290, 88 S.Ct. at 1593. They produced evidence that Continental, Harris and Pullman communicated directly regarding the interest rates each was going to charge; Continental, Harris, Pullman and Central took joint action on legislation regarding legal interest rates and on most other aspects of the charge card system; and that all four banks had a motive to agree to fix interest rates. All of these factors have been held sufficient, when combined with a showing of parallel behavior to withstand motions for summary judgment. *See De Jong Packing Co. v. United States*, 618 F.2d 1329, 1334 (9th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980); L. Sullivan, *Antitrust* § 110 at 316 (1977). Plaintiffs, having presented evidence from which an agreement to fix prices may rationally be inferred, should be given a chance to present their case against these four defendants to a jury.

On the other hand, plaintiffs presented significantly less evidence regarding defendant American's participation in the horizontal conspiracy. American did send a representative to the formal group meetings, but there is little other evidence that it met with the other defendants on a formal or informal basis. It did not partici-pate in drawing up the formal agreement, nor did it sign the agreement with the other defendants. It did not participate in the lobbying activities with other defendants. Most important, it did not have the motive to conspire to set an 18% interest rate as did the other defendants. By the time American issued its charge card, the 18% credit card interest rate legislation had been in effect for two years. Every other bank seemed firmly set in its pattern of charging an 18% interest rate. Thus, American did not have to worry about being undercut by its competitors, and was free to set the rate it felt would be best for recouping start-up costs and initial losses. Plaintiffs did not introduce sufficient evidence of American's role in the conspiracy and motive to conspire to overcome American's denial of price fixing.

## III.   THE VERTICAL CONSPIRACY

I agree with the majority's decision affirming the summary judgments granted defendants Continental, Harris and Central regarding the alleged vertical conspiracies with their respective correspondents. I also agree that if there were no horizontal conspiracy, plaintiffs would lack standing to assert a vertical conspiracy claim against defendant Pullman.